

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34531-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANTE DUPREE OLIVER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — Dante Oliver appeals his convictions and sentence for human trafficking and promoting commercial sex abuse of a minor. We find no error and affirm the convictions and sentence.

FACTS

This appeal arises from Dante Oliver's relationship with and exploitation of Victoria Blake. Blake, born in May 1998, ran away from home on July 21, 2014, to live with Patricia Harvey. Victoria Blake and her mother's name are pseudonyms. Harvey, a prostitute, introduced Blake to others in the sex trade, and sixteen-year-old Blake soon entered the business. Harvey and associates marketed Blake on the Backpage website. Blake's customers paid Harvey and her confederates, and Blake received cocaine from

Harvey.  Law enforcement eventually prosecuted Harvey and returned Blake to her mother.

In autumn 2014, sixteen-year-old Victoria Blake befriended female Rosie Williams on Facebook.  Williams often commented on Blake's Facebook photos and entries, including Blake's observations about the sex trade.  On November 10, Blake again ran away to meet a gentleman at a ubiquitous McDonald's restaurant.  The man Blake met at the restaurant took her to Rosie Williams' house.  Blake and Williams thereafter began a sexual relationship.

Within a week of leaving home the second time, Victoria Blake met defendant Dante Oliver at Rosie Williams' home.  Oliver also occupied the residence.  Blake learned that Williams and Oliver also maintained a sexual relationship and that Williams labored as a prostitute for Oliver.  A few days after the two met, Oliver and Blake dined together at the ubiquitous McDonald's restaurant.  Oliver then described his background and his entry into pimphood.  Oliver apprised Blake that, on return to the Oliver and Williams abode, Oliver would select scandalous photographs of females resembling Blake to publish on the website Backpage.

Dante Oliver thereafter posted photographs of women with similar features to Victoria Blake on Backpage, but no photographs of Blake to prevent Blake's family from identifying her.  For example, Oliver loaded images, which comprised seductive snaps of a woman similar in appearance to Blake from the neck down, on the website.  Oliver

2

stationed Blake's cell phone number on the posting, and Oliver listed Blake's charges:

$200 for one hour, $150 for a half an hour, and $100 for fifteen minutes.

Dante Oliver taught Victoria Blake rules to follow that would protect Blake, Rosie

Williams, and himself from law enforcement detection. Blake carefully followed

Oliver's instructions, which included:

> Q. Okay. So you get a message saying, "I want to meet with you for sex." What happens next?
> A. Well, they have to call me. I have to hear their voice.
> Q. Okay. And who set up that rule?
> A. [Dante Oliver].
> Q. Okay. And did anybody have to be in the room when you heard their voice or would your word suffice that you heard their voice?
> A. It would be my word.
> Q. Okay. So you would hear their voice, and then what would happen?
> A. And then I would send them the address. I told them that I would send them the address, and I was to send them the McDonald's address. And then once they got to the McDonald's address, then they were to call me, and I would give them my real address.
> . . . .
> Q. Okay. So once they arrive at Rosie and Dante Oliver's house, what happens to Ms. Williams and Mr. Oliver? Are they there while you're doing ads or what?
> A. While they're—while they text me and we wait for them to go to McDonald's, once they tell me that they're at McDonald's, [Oliver] and Rosie go to McDonald's to, like, stay there, and I'm to text them after the call leaves.

Report of Proceedings (RP) at 216-18.

On December 10, 2014, one month after Victoria Blake and Dante Oliver's first

McDonald's meeting, law enforcement detained Oliver. In the meantime, Blake serviced

3

ten to fifteen men and redirected all earnings to Oliver. After Oliver's arrest, Blake

vacated Rosie Williams' and Dante Oliver's abode.

Victoria Blake resided at her brother's father's house until her mother, Mindy

Blake, angrily accosted her. The mother telephoned law enforcement when Blake

refused to fulfill the mother's wishes. Law enforcement deposited Blake in a dwelling

for troubled youth. Blake fled the youth home after three days. Police apprehended

Blake and returned her to her mother.

Mindy Blake confiscated two cell phones possessed by her daughter. The mother

also garnered domestic violence no contact orders that prohibited Rosie Williams and

Dante Oliver from contact with Victoria Blake. With her mother's approval, Blake

relocated to the residence of her brother's father, Reginal Palmer, and Palmer's girlfriend,

Jennifer Deshong.

Jennifer Deshong gifted Victoria Blake a cell phone for Christmas in 2014. Blake

again conversed with Rosie Williams on Facebook and on her cellphone. Deshong

allowed Blake to spend the night at Williams' house while Dante Oliver reposed in jail.

On January 9, 2015, Victoria Blake left Reginal Palmer's dwelling to live with

Rosie Williams. Williams then handed Blake a letter Dante Oliver wrote from jail, which

letter directed:

> "I want you posting [on Backpage] every day and making at least
> 200 a day . . . 'we've been through this already.'"

4

RP at 243.

Victoria Blake again marketed her body for sex at Dante Oliver's home and once at a motel. Blake performed services both with Williams and independently. Blake understood that the pair's earnings paid for online advertisements, Oliver's phone calls from jail, rent for Oliver's and Williams' residence, and other enterprise expenditures. Blake deposited all income into Rosie's wallet.

Spokane County Sheriff employee Erica Rivas administered a program that located juvenile runaways. In January 2015, Rivas craftily located Victoria Blake's Facebook page, on which Blake employed the alias "Laquita Johnson." RP at 436. Blake claimed on the Facebook page to be married to Rosie Williams and to maintain a friendship with Tay Inya-Mouf. During trial testimony, Blake called Dante Oliver "Tay," presumably Oliver's professional moniker. Erica Rivas searched records that listed Dante Oliver as a suspect in the crime of violating a court order benefitting Rosie Williams. Rivas compared a photograph of Oliver contained in a sex offender registry with a photo of "Tay Inya-Mouf." RP at 437. The two were one.

Law enforcement again located Victoria Blake. Police confiscated a cell phone used by Blake. The Spokane County Sheriff's Office extracted and analyzed data from the cell phone. Erica Rivas transcribed seventy jail phone calls and texts between Dante Oliver, Rosie Williams, and Victoria Blake. A plethora of text messages from November 20, 2014, onward manifested continuing prostitution.

5

PROCEDURE

On February 29, 2016, the State of Washington charged Dante Oliver, in a third amended complaint, with promoting commercial sex abuse of a minor, human trafficking in the second degree, and a felony violation of a domestic violence no contact order. The State alleged that the crimes occurred between November 20, 2014 and February 13, 2015.

Before trial, Dante Oliver moved in limine to prevent the State from introducing evidence of his earlier sex offenses. Oliver's counsel argued:

> I wanted to put on the record a formal motion to prohibit [the S]tate from introducing evidence that my client has a prior sex offense conviction. He does have a prior. I believe it's a misdemeanor conviction out of Clark County, Nevada. He also has a conviction for failing to register as a sex offender locally or somewhere in Washington. I'm asking that their witnesses not mention that and that they be admonished to not mention the fact that he has a prior sex offense, please.

RP at 179. In response, the State assured that its witnesses would be cautioned to make no mention of Oliver's past convictions. The court granted Oliver's motion in limine.

The State called Erica Rivas to testify as part of its case-in-chief. Rivas' testimony included the following exchange:

> Q. And what did you find when you ran Rosie Lee Williams' name through that database?
> A. There was the last entry from December 10th, 2014. She was the victim of a court order violation with Dante Oliver listed as the suspect in that.

6

Q. Okay. And did you then look for a photograph of Dante Oliver?
A. Not at that—I didn't have a SPRS photo. I got that photo from the registered sex offender coordinator.

RP at 437. Dante Oliver's counsel objected and requested a limiting instruction. The

trial court sustained the objection, allowed Rivas' remark "not at that time" to stand, and

struck the remaining answer from the record. RP at 437. The court commented:

I'm going to sustain the objection and strike that answer at this point. The question was whether you looked for a photograph, and the answer was, "not at that time." So that's the answer I'm allowing to stand.

RP at 437.

Spokane County Sheriff Detective Damon Simmons testified following Erica

Rivas, and before Simmons' testimony concluded, the court recessed. Prior to the recess

but outside the presence of the jury, the following colloquy occurred:

MR. GRIFFIN [Defense Counsel]: Judge, I'm sorry.
THE COURT: Oh, do you have something to say?
MR. GRIFFIN: I do.
THE COURT: Go ahead, Mr. Griffin.
MR. GRIFFIN: Judge, I hate this, but I'm—I have to move for a mistrial. It was very clear that the state did not intend to elicit the testimony about my client's status as a registered sex offender. It was the only motion in limine that I brought, and I think the state's been careful to try and not go into that area.
Unfortunately, some very clear testimony that Ms. Rivas located him on the county sex offender registration, whatever database was heard by the jury. I know that the state [S]upreme [C]ourt has found this type of evidence incredibly prejudicial, I mean, specifically in [*State v. Gresham*, 173 Wn.2d 405, 269 P.3d 207 (2012)]. I don't need to go into it, but the court overruled a statute that purported to allow testimony like this or evidence like this in. They said it's so unfair that the statute was in fact unconstitutional.

7

Again, I think I've been clear, but I know the state didn't do it on purpose. But the 13 members of our jury, all of them have heard that my client's a registered sex offender. I don't believe he can have a fair trial at this point, especially given the nature of the charges and all of the other evidence. I'm forced to move for a mistrial. To be clear, no one here wants it, but I have to.

RP at 470-71.

After the recess, the trial court further entertained additional discussion of Dante

Oliver's motion for a mistrial. The State remarked:

[T]he unfortunate situation we have here differs from what we have in *Gresham* is that in *Gresham*, there was—there was all kinds of testimony about a prior sex offense and how the defendant was a sex offender. They brought in the prior judgment and sentences. They talked about it. It was—it was a part of the prosecution's case-in-chief, and there was no doubt left with the jury that in fact that defendant was a registered sex offender and had prior convictions.
But I would point out what we had here was we had, unfortunately, a witness who proffered more information than what I was intending to ask her. . . .
. . . So where I would draw the line in this matter is that we don't have any information about where this coordinator got the photograph. We just know that Ms. Rivas was able to work with another professional who she works with as a part of her course of business, and she got the photograph.
There was no testimony that Mr. Oliver is a registered sex offender. There was no testimony that he has a prior conviction for a sex offense.

RP at 475-76. The court inquired about the State's instructions to witnesses:

THE COURT: Can you put on the record what you did to advise Ms. Rivas of the motion in limine?
MR. TREECE: Your Honor, I had spoken to Ms. Rivas prior and had told her not to mention it.
THE COURT: You talked to her about it after I made my ruling on the motion in limine?

8

MR. TREECE: I don't remember if I did this morning.  I had on a
prior occasion.

RP at 477.  After a thorough analysis of the motion on the record, the trial court

denied Dante Oliver's motion for a mistrial.

The State introduced as evidence Dante Oliver's posts on Backpage and letters

Oliver wrote from prison to Victoria Blake imploring her to continue working as a

prostitute.  During closing argument, Oliver admitted to being incarcerated on December

10, 2014.

The jury convicted Dante Oliver of promoting commercial sexual abuse of a

minor, human trafficking in the second degree, and felony violation of a court order.  At

sentencing, Oliver argued the court should treat second degree human trafficking and

promoting commercial sex abuse of a minor as the same criminal conduct, which would

score Oliver with two, not four, violations.  The trial court rejected the same criminal

conduct argument.  The sentencing court discussed both the merger doctrine and double

jeopardy when explaining its ruling.  With an offender score of four, the trial court

sentenced Oliver to a concurrent one hundred and forty-seven months for the two counts.

LAW AND ANALYSIS

Dante Oliver raises two contentions on appeal.  First, he contends that the trial

court committed error when refusing to grant his motion for a mistrial after the State's

witness violated the order in limine and testified that Oliver maintained a criminal

conviction history. Second, the trial court committed error when refusing, during

sentencing, to consider his respective convictions for human trafficking and promoting

commercial sex abuse of a minor.

Mistrial

Dante Oliver first faults the trial court for denying a mistrial after Erica Rivas

testified that she searched for a photograph of him from the sexual offender registry

coordinator. Based on the circumstances during under which this impermissible

testimony arose, the trial court's subtle response to the inadmissible testimony, and the

overwhelming evidence of guilt, we disagree.

A reviewing court considers three factors when deciding whether an irregularity

warrants a new trial: (1) the seriousness of the irregularity, (2) whether the statement was

cumulative of evidence properly admitted, and (3) whether the irregularity could be cured

by an instruction. *State v. Post*, 118 Wn.2d 596, 620, 826 P.2d 172, 837 P.2d 599 (1992);

*State v. Escalona*, 49 Wn. App. 251, 255, 742 P.2d 190 (1987). A mistrial should be

granted when the defendant has been so prejudiced that nothing short of a new trial can

insure that the defendant will be tried fairly. *State v. Gamble*, 168 Wn.2d 161, 177, 225

P.3d 973 (2010). The trial court sits in the best position to determine if a trial irregularity

caused prejudice. *State v. Perez-Valdez*, 172 Wn.2d 808, 819, 265 P.3d 853 (2011).

We address the three factors in the context of Dante Oliver's trial. We agree an

irregularity occurred. The trial court granted an order in limine to preclude any statement

regarding Oliver's prior sex offenses, and the jury heard such a statement. Each party holds the duty to prepare witnesses for trial, and a violation of a pretrial order constitutes a serious trial irregularity. *State v. Gamble*, 168 Wn.2d at 178; *State v. Montgomery*, 163 Wn.2d 577, 592, 183 P.3d 267 (2008). Evidence of a defendant's prior criminal conduct impermissibly shifts the jury's attention from the crime charged to the defendant's propensity for criminality. *State v. Perrett*, 86 Wn. App. 312, 320, 936 P.2d 426 (1997). The State did not purposely solicit the violative testimony from Erica Rivas. Nevertheless, courts do not consider whether the statement was deliberate or inadvertent. *State v. Weber*, 99 Wn.2d 158, 164-65, 659 P.2d 1102 (1983).

Erica Rivas' comment did not overtly declare that Dante Oliver suffered an earlier conviction or was a registered sex offender. Nevertheless, as noted by the trial court, the jury could infer such conclusions. At the same time, the jury heard no other testimony regarding Oliver's past sexual convictions or his status as a sex offender.

Dante Oliver principally relies on *State v. Escalona*, 49 Wn. App. 251 (1987). In *Escalona*, the State convicted Alberto Escalona of second degree assault with a deadly weapon. During the trial, a witness testified that he feared Escalona because Escalona "already has a record and had stabbed someone." 49 Wn. App. at 253. The trial court struck the statement from the record, but did not declare a mistrial. Although the State predicated its case largely on the witness' testimony, the trial court found the statement as a whole to be inconsistent with other evidence, not cumulative of other evidence

11

proffered, and curable with a proper instruction. This court reversed and held that the trial court abused its discretion in not granting a mistrial.

In overturning the verdict, in *State v. Escalona*, this court characterized the impermissible testimony as "extremely serious." 49 Wn. App. at 255. The prejudicial statement referenced a prior conviction when Alberto Escalona previously stabbed someone. Evidence of a stabbing conviction constituted impermissible propensity evidence in a trial involving second degree assault with a knife. The witness also definitively stated that Escalona had a "record." This court measured the reference to Escalona's record as serious considering the paucity of credible evidence against him.

Erica Rivas' impermissible testimony differs from the inadmissible evidence in *Escalona*. Rivas' statement required jurors to make the logical leap that since the photograph came from the registered sex offender coordinator, Oliver committed a prior sex crime, and, therefore, he had a proclivity for sex crimes and trafficked Victoria Blake. Nevertheless, Rivas' statement did not label Oliver a sex offender, nor mention any past convictions. Defense counsel did not repeat the prejudicial statement when objecting, nor did the trial court when sustaining the objection.

This court measures the seriousness of an irregularity by considering its nature, the effect of the defense strategy, and the overall strength of the State's case. *State v. Hopson*, 113 Wn.2d 273, 286, 778 P.2d 1014 (1989). Unlike in *Escalona*, the State presented abundant evidence of Dante Oliver's guilt. Victoria Blake testified to the

disturbing details of how Oliver and Rosie Williams manipulated and gained financial advantage from an insecure high school teenager. The State admitted as exhibits the damning posts on Backpage and texts to Blake imploring her to labor as a prostitute. Oliver admitted to being incarcerated for another crime when he sent messages to Blake. Oliver never directly denied goading Blake into prostitution.

Reviewing courts are skeptical of the presumption jurors will follow a curative instruction to disregard stricken testimony. An instruction to disregard evidence cannot logically be said to remove the prejudicial impression created when the evidence admitted into trial is inherently prejudicial and of such nature as to likely impress itself on the minds of the jurors. *State v. Miles*, 73 Wn.2d 67, 71, 436 P.2d 198 (1968). Nevertheless, the State did not repeat the impermissible testimony and never mentioned it in summation. The trial court adroitly screened and diverted the jury's attention from the impermissible testimony. The court repeated the proper question, retold the proper and narrow response to the question, and then indicated the broader nonresponsive answer was stricken. The jury heard no testimony regarding Oliver's sexually deviant predilections, nor his past convictions.

The trial court also delivered the jury with multiple instructions to disregard and not consider testimony stricken from the record. The court instructed the jury to ignore stricken evidence at the time Erica Rivas uttered her remark, in the jury's written instructions, and also during the closing instruction. This court must presume that the

jury followed the judge's instructions to disregard the remark. *State v. Weber*, 99 Wn.2d at 166 (1983).

We review a trial court's decision of whether an inadmissible statement is so prejudicial as to require a mistrial for an abuse of discretion. *State v. Weber*, 99 Wn.2d at 166; *State v. Perez-Valdez*, 172 Wn.2d at 819 (2011). Dante Oliver's trial court did not abuse its discretion.

Sentencing

The trial court deemed the respective convictions for human trafficking and commercially exploiting a minor as discrete convictions for purposes of calculating Dante Oliver's offender score. Dante Oliver contends that the trial court erred when refusing to consider the crimes as the same criminal conduct. We disagree.

We review a trial court's determination of what constitutes the same criminal conduct for abuse of discretion or a misapplication of the law. *State v. Aldana Graciano*, 176 Wn.2d 531, 537, 295 P.3d 219 (2013); *State v. Mutch*, 171 Wn.2d 646, 653, 254 P.3d 803 (2011). A trial court abuses its discretion if it makes a manifestly unreasonable decision based on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

When an individual is sentenced for two or more current offenses, the sentencing court calculates the number of current convictions and prior convictions for purposes of reaching an offender score, unless two or more crimes involve the same criminal conduct.

14

RCW 9.94A.589(1)(a). The offender score influences, in part, the standard range

sentence for the offender.

RCW 9.94A.589(1)(a) defines "same criminal conduct" as follows:

> "Same criminal conduct," as used in this subsection, means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim.

The defendant carries the burden of establishing that the crimes constitute the same

criminal conduct because a finding by the sentencing court of same criminal conduct

benefits the defendant. *State v. Johnson*, 180 Wn. App. 92, 104, 320 P.3d 197 (2014).

Dante Oliver contends that the trial court erred when finding that promoting sexual

abuse of a minor and second degree trafficking do not encompass the same criminal

conduct. The State admits that it incorrectly argued to the trial court that the court should

perform the same analysis in calculating the offender score as performed when

determining the applicability of the doctrine of merger or double jeopardy. A

determination that a conviction does not violate double jeopardy does not automatically

mean that two convictions constitute the same criminal conduct for sentencing purposes.

*State v. Chenoweth*, 185 Wn.2d 218, 222, 370 P.3d 6 (2016). Double jeopardy analysis

analyzes whether one act constitutes two convictions, and same criminal conduct analysis

assesses whether two convictions warrant separate punishments. *State v. Chenoweth*, 185

Wn.2d at 222. We need not and do not determine whether merger or double jeopardy

apply in Dante Oliver's prosecution.

15

To analyze whether Dante Oliver's convictions for human trafficking and commercial exploitation of a minor qualify as the same criminal conduct, we review the statutes creating the crimes and the underlying facts of the convictions. RCW 9.68A.101(1) declares:

A person is guilty of promoting commercial sexual abuse of a minor if he or she knowingly advances commercial sexual abuse or a sexually explicit act of a minor or profits from a minor engaged in sexual conduct or a sexually explicit act.

One commits the crime of trafficking in the second degree when he:

Recruits, harbors, transports, transfers, provides, obtains, buys, purchases, or receives by any means another person knowing, or in reckless disregard of the fact, that force, fraud, or coercion as defined in RCW 9A.36.070 will be used to cause the person to engage in forced labor, involuntary servitude, a sexually explicit act, or a commercial sex act, or that the person has not attained the age of eighteen years and is caused to engage in a sexually explicit act or a commercial sex act.

RCW 9A.40.100(3)(a)(i).

The parties agree that Dante Oliver's crimes victimized Victoria Blake and that Oliver's residence served as the locus of the crimes. Therefore, we address whether the charges of trafficking in the second degree and promoting commercial sexual abuse of a minor involved the same time and intent.

Dante Oliver asserts that the two crimes transpired at the same time since the State asserted overlapping charging periods for both trafficking and promoting sexual abuse of a minor between November 20, 2014 and February 13, 2015. We deem the charging

16

periods to lack relevance.

*State v. Aldana Graciano*, 176 Wn.2d 531 (2013) informs our decision. The trial court found that Julio Aldana Graciano failed to establish that his convictions for first degree child rape and first degree child molestation occurred at the same time for purposes of sentencing. The Supreme Court noted:

> At best, the record is unclear. [The victim's] testimony discussed various incidents in a disjointed manner, with no suggestion the incidents were continuous or simultaneous, or happened sequentially within a short time frame.

*State v. Aldana Graciano*, 176 Wn.2d at 541.

Dante Oliver's trial parallels Julio Aldana Graciano's trial. The bulk of the State's evidence came through the testimony of Victoria Blake. Blake's rambling testimony failed to identify when distinct criminal acts occurred and ended. The testimony contained no starting times and ending times for the respective crimes. Dante Oliver likely promoted the commercial sexual abuse of Victoria Blake when he wrote, from his jail cell, a letter to Blake admonishing her to post on Backpage every day. Oliver likely earlier enticed Blake into the sex trade and into forced labor and thereby engaged in human trafficking when addressing her at the McDonald's restaurant.

Dante Oliver argues that he possessed the same criminal intent for personal financial gain from Victoria Blake's engagement in prostitution such that his motivation

17

remained the same for the separate trafficking and promoting offenses. The State posits

that discrete intents could have engendered the respective crimes.

In the context of "same criminal conduct," "intent" is not the mens rea required for

the crime, but rather the defendant's "objective criminal purpose in committing the

crime." *State v. Davis*, 174 Wn. App. 623, 642, 300 P.3d 465 (2013) (quoting *State v.*

*Adame*, 56 Wn. App. 803, 811, 785 P.2d 1144 (1990)). In construing the "same criminal

intent" prong, the standard is the extent to which the criminal intent, objectively viewed,

changed from one crime to the next. *State v. Vike*, 125 Wn.2d 407, 411, 885 P.2d 824

(1994).

In finding that the two crimes did not stem from similar criminal conduct, the

sentencing court noted:

> And one of those examples . . . is that under the promoting, one way
> of proving that matter is to procure/solicit customers; that has nothing to do
> with the trafficking. And the trafficking, they have to prove recruiting,
> harbored, obtained, or received Ms. [Blake]; and again, that is not what has
> to be proved under the advances commercial sexual abuse.
>     . . . .
>     . . . [O]ne of the things I struggled with is there are multiple ways
> you can commit each crime, and the jury wasn't given a special
> interrogatory to say which one of these elements you found, but there was
> evidence to support both that he procured and solicited customers and that
> he recruited, harbored, and obtained [Blake] to engage in prostitution.

RP at 786-87.

Dante Oliver's intent differed in the days leading to his December arrest when

Oliver, Victoria Blake, and Rosie Williams lived under the same roof. Oliver then

18

schemed and carefully orchestrated a plan to harbor Blake inside his home and away from law enforcement, Blake's family, or anyone seeking the sixteen-year-old runaway. Oliver then employed elaborate machinations, replete with detailed instructions designed for no purpose other than to secrete Blake so she could later engage in prostitution to Oliver's benefit. When residing in jail, Oliver focused on his directions to Blake to engage in prostitution. Therefore, a finder of fact could conclude that Oliver's objective and criminal intent differed when committing the respective crimes.

## CONCLUSION

We affirm Dante Oliver's convictions and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, C.J.

WE CONCUR:

Korsmo, J.

Pennell, J.