# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>JEFFREY MICHAEL SNYDER,<br><br>Appellant. | DIVISION ONE<br><br>No. 81286-6-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — Jeffrey Snyder appeals from his convictions of unlawful imprisonment and assault in the fourth degree. Snyder contends that the trial court deprived him of the right against double jeopardy by entering judgment on the jury's verdicts. Additionally, Snyder asserts that the trial court erred by (1) ruling that the two offenses did not constitute the same criminal conduct for sentencing purposes, and (2) entering orders restricting Snyder's ability to contact his children. Because Snyder fails to establish an entitlement to relief on any of these claims, we affirm his convictions and the sentences imposed thereon.

Additionally, Snyder asserts that the trial court mistakenly ordered him to pay supervision fees as determined by the Department of Corrections (DOC). Because the record indicates that the trial court waived the requirement that he pay supervision fees, we remand for the trial court to strike this requirement from the judgment.

I

Jeffrey Snyder was involved in a relationship with Angela Klemme. Snyder and Klemme had two children together who, during the incidents at issue, were nine months and two-years old.  In addition to these children, Klemme is the mother of three children who were 10, 13, and 18 years old.  Snyder and Klemme, along with the five children, had lived together in a house in Marysville.

Klemme testified that, in April 2019, she and the five children moved out of the house because Snyder was using drugs.  Klemme was unwilling to stay in the relationship unless Snyder stopped using drugs.  After moving out of the house, Klemme occasionally visited Snyder with their two children.

On September 7, 2019, Klemme and the two youngest children visited the house in which Snyder was then residing.  Klemme and the children planned to see Snyder because he was scheduled to enter a rehabilitation facility on September 9.  Klemme and the children stayed the night.

Klemme testified that, the following day, Snyder "wasn't himself" and was "angry."  Around 2:00 p.m., Klemme informed Snyder that she had to leave in order to pick up her 10-year-old and 13-year-old children, who were each staying at separate friend's houses.  However, in a recorded statement, which was admitted into evidence at trial, Klemme stated that Snyder told her that she "wasn't leaving."  Snyder and Klemme then started to argue about whether she could leave the house in order to pick up her children.  Snyder told Klemme that he "was going to hurt" her.

Also in this recorded statement, Klemme explained an incident in which Snyder threw her to the ground and started hitting her:

> He grabbed my, grabbed me by the hair and threw me on the ground. From the bed to the ground. With my nine-month-old in my arms. And he was holding our two-year-old. And then proceeded to, I don't know where, what he was doing, he was hitting me. He didn't really hit me in the face, it was more. I had, well, I had my hands over my face when he was doing it. I try and protect the baby as well. And then I got back up and tried to run out the door. And he grabbed me and pulled me back on him as I ended up rolling over him and the two-year-old.

Klemme also stated that, while Snyder was hitting her, she "still had the baby in [her] arms." After Snyder stopped hitting her, Klemme stated that Snyder sat in front of the door and "wouldn't let [her] leave." Snyder also took Klemme's cell phone away from her. Klemme believed that he took her cell phone because she "threatened to call the cops."

At one point, Klemme attempted to leave the house and Snyder "grabbed" her and, according to Klemme, "literally threw [her] into the garage" before closing the garage door. Snyder then "pushed" Klemme on to a couch that was located inside the garage. After pushing Klemme on to the couch, Snyder threw a lighter at her leg and "hit" her in the face with his finger. While Snyder and Klemme were in the garage, Snyder smoked methamphetamine in front of the children.

In the recorded statement, Klemme also described several occasions where Snyder refused to let Klemme stand up:

> When I'd sit on the bed, he wouldn't let me stand up. Like I had to sit the whole time. I had to sit in the bedroom on the bed or if I was in the garage, I had to sit on the couch. Like if I stood up he would demand me, like, "Sit down right now."

3

Klemme stated that she was worried that Snyder would "beat [her] up" if she attempted to leave.

At one point, Snyder grabbed a knife and started stabbing the wall. In the recorded statement, Klemme described the incident involving the knife as follows:

> When we were in there, he would stab the wall and tell me that, umm, if I didn't—because he thinks I'm sleeping with everybody. I cheated, and I have people over at my house all the time. Umm, anyways, he thinks that I am cheating, and he would ask me over and over and I told him the same thing all the time like, "No." And he would stab the wall. And he would tell me, if I don't tell him the truth, "It's going to get close to you." And he's like, "Go," you know, closer to where I was standing.

Klemme also stated that, when Snyder was stabbing the wall with the knife, she was "scared." Klemme stated that Snyder told her that "he would like to kill" her "but he couldn't because that would be a sin or something." Klemme stated that, if the children were not also in the house, Snyder "would have hurt" her or "killed" her.

Sometime in the afternoon, Klemme's 13-year-old daughter telephoned Klemme's cell phone. Snyder permitted Klemme to use her cell phone so that Klemme could return her daughter's call. Klemme telephoned her daughter and informed her that Snyder was not allowing her to leave the house. Klemme also informed her daughter that "it was an emergency" and that she should inform her grandparents. At this time, Klemme hoped that the grandparents would telephone the police.

Klemme's daughter then telephoned Klemme's mother, Arlene Klemme. Arlene then telephoned 911 and informed the dispatcher that there was an "emergency" taking place at Snyder's house. Arlene told the dispatcher that Klemme "couldn't leave to go get her daughter."

At 6:50 p.m., Officers Joseph Belleme and Belinda Paxton, along with two other police officers, arrived at Snyder's house. After the officers arrived, Officer Belleme saw Klemme through a window and signaled her to come to the front door. As Officers Belleme and Paxton approached the house, Klemme opened the front door. Standing outside the front door, Officer Belleme saw Klemme "running up the stairs" inside the house with the youngest child held by her left arm. According to Officer Belleme, Klemme "had the look of terror on her face" and was crying.

Officer Belleme then saw Snyder "racing up behind" Klemme. Snyder grabbed Klemme's right arm. In a panicked voice, Klemme screamed, "No." Officer Belleme then grabbed Snyder and "pushed him up against the wall." Officer Belleme placed handcuffs on Snyder's wrists and informed him that he was being detained. Snyder was subsequently placed under arrest.

The State charged Snyder with one count of unlawful imprisonment and one count of assault in the second degree. The count of assault in the second degree alleged that Snyder "did intentionally assault another person, to-wit: Angela Klemme, with a deadly weapon, to-wit: a knife." Following a jury trial, the jury found Snyder guilty of unlawful imprisonment, with a domestic violence

5

aggravator related to that charge, and the inferior degree crime of assault in the fourth degree.

At sentencing, the trial court found that the unlawful imprisonment and assault in the fourth degree offenses did not constitute the same criminal conduct. On the charge of unlawful imprisonment, the trial court sentenced Snyder to 22 months of incarceration and 12 months of community custody. On the charge of assault in the fourth degree, the trial court imposed 60 months of probation along with a suspended sentence of 364 days.

Snyder appeals.

II

Snyder contends that the trial court violated the double jeopardy clauses of the United States and Washington Constitutions by entering judgment on separate convictions for unlawful imprisonment and assault in the fourth degree. Accordingly, he avers, his conviction for assault in the fourth degree should be vacated. Because the record makes clear that the convictions for unlawful imprisonment and assault in the fourth degree were based on different acts, entering judgment on each did not violate the double jeopardy protection of either the federal or state constitutions.

"Claims of double jeopardy are questions of law, which we review de novo." State v. Hughes, 166 Wn.2d 675, 681, 212 P.3d 558 (2009). "The United States Constitution provides that a person may not be subject for the same offense to be twice put in jeopardy of life or limb." Hughes, 166 Wn.2d at 681 (citing U.S. CONST. amend. V). "Similarly, the Washington State Constitution

6

provides that a person may not be twice put in jeopardy for the same offense." Hughes, 166 Wn.2d at 681 (citing WASH. CONST. art. I, § 9).

The protection against double jeopardy prevents a person from being (1) prosecuted for the same offense after acquittal, (2) prosecuted a second time for the same offense after conviction, or (3) subjected to multiple punishments for the same offense. State v. Fuller, 185 Wn.2d 30, 33-34, 367 P.3d 1057 (2016). The legislature determines what constitutes an "offense" for the purposes of the double jeopardy clause. Sanabria v. United States, 437 U.S. 54, 69-70, 98 S. Ct. 2170, 57 L. Ed. 2d 43 (1978).

Our Supreme Court has set forth a four-part framework for determining whether multiple convictions result in a double jeopardy violation. First, we search for express or implicit legislative intent to punish the crimes separately; if this intent is clear, then we look no further. State v. Freeman, 153 Wn.2d 765, 771-72, 108 P.3d 753 (2005). Second, if there is no clear indication of legislative intent, we apply the "same evidence" test to the charged offenses. Freeman, 153 Wn.2d at 772. "Third, if applicable, the merger doctrine is another aid in determining legislative intent, even when two crimes have formally different elements." Freeman, 153 Wn.2d at 772. "Finally, even if on an abstract level two convictions appear to be for the same offense or for charges that would merge, if there is an independent purpose or effect to each, they may be punished as separate offenses." Freeman, 153 Wn.2d at 773.

Applying this analysis, we have previously held that neither RCW 9A.40.040 nor RCW 9A.36.041 "expressly authorizes cumulative punishment for

acts committed in the commission of either crime." State v. Frohs, 83 Wn. App. 803, 813, 924 P.2d 384 (1996). Therefore, we apply the "same evidence" test to determine whether Snyder's convictions of unlawful imprisonment and assault in the fourth degree resulted in a double jeopardy violation. This test provides:

> "Each of the offenses created requires proof of a different element. The applicable rule is that where *the same act or transaction* constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision *requires proof of a fact* which the other does not. *Gavieres v. United States*, 220 U.S. 338, 342, [31 S. Ct. 421, 55 L. Ed. 489 (1911),] and authorities cited. In that case this court quoted from and adopted the language of the Supreme Court of Massachusetts in *Morey v. Commonwealth*, 108 Mass. 433: 'A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.'"

In re Pers. Restraint of Orange, 152 Wn.2d 795, 817, 100 P.3d 291 (2004) (alteration in original) (quoting Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)).

Under this test, "[i]f each crime contains an element that the other does not, we presume that the crimes are not the same offense for double jeopardy purposes." Freeman, 153 Wn.2d at 772. However, "we do not consider the elements solely in the abstract; we consider the elements as the State charged and proved the offenses." State v. Davis, 174 Wn. App. 623, 633, 300 P.3d 465 (2013) (citing Freeman, 153 Wn.2d at 777).

In Davis, the court held that "two crimes were not the same in fact for double jeopardy purposes" because "the State proved each crime with different evidence." 174 Wn. App. at 632. Indeed, "*Blockburger* permits a subsequent

prosecution under an indictment listing identical legal elements so long as it charges a different set of facts. That much is obvious." United States v. Trabelsi, 845 F.3d 1181, 1198 (D.C. Cir. 2017) (Pillard, J., concurring). This is so because the "same evidence" test applies only when the statutes in question do not expressly authorize multiple punishments for the *same act*. See State v. Calle, 125 Wn.2d 769, 777-78, 888 P.2d 155 (1995).

"'[I]n reviewing allegations of double jeopardy, an appellate court may review the entire record to establish what was before the court.'" State v. Mutch, 171 Wn.2d 646, 664, 254 P.3d 803 (2011) (quoting State v. Noltie, 116 Wn.2d 831, 848-49, 809 P.2d 190 (1991)). "Considering the evidence, arguments, and instructions, if it is not clear that it was '*manifestly apparent* to the jury that the State [was] not seeking to impose multiple punishments for the same offense' and that each count was based on a separate act, there is a double jeopardy violation." Mutch, 171 Wn.2d at 664 (alteration in original) (quoting State v. Berg, 147 Wn. App. 923, 931, 198 P.3d 529 (2008)).

Here, the record makes clear that Snyder's convictions of unlawful imprisonment and assault in the fourth degree were based on different acts. First, the charging document indicated that the assault charge regarded only the incident during which Snyder stabbed the wall with a knife. See Noltie, 116 Wn.2d at 848-49 (reviewing the information to determine whether there was a double jeopardy violation). Indeed, with regard to the charge of assault in the second degree, the information provided, in pertinent part:

> That the defendant, on or about the 8th day of September, 2019,
> did intentionally assault another person, to-wit: Angela Klemme,

9

with a deadly weapon, to-wit: a knife; proscribed by RCW 9A.36.021(1)(c), a felony; and that *at the time of the commission of the crime, the defendant or an accomplice was armed with a deadly weapon other than a firearm, to wit: a knife*, as provided and defined in RCW 9.94A.533(4) and RCW 9.94A.825.

(Emphasis added.)

Thus, the assault was alleged to have transpired only when Snyder stabbed the wall with a knife.

Additionally, during closing arguments, both the State and Snyder clearly specified which of Snyder's acts served as the basis for each crime charged. "When the prosecution presents evidence of multiple acts of like misconduct, any one of which could form the basis of a count charged, either the State must elect which of such acts is relied upon for a conviction or the court must instruct the jury to agree on a specific criminal act." State v. Coleman, 159 Wn.2d 509, 511, 150 P.3d 1126 (2007). "Such an election by the State need not be formally pleaded or incorporated into the information." In re Pers. Restraint of Knight, 196 Wn.2d 330, 340, 473 P.3d 663 (2020). Rather, "[a]s long as the election clearly identifies the particular acts on which charges are based, verbally telling the jury of the election during closing argument is sufficient." Knight, 196 Wn.2d at 340.

During the State's closing argument, the prosecutor made an election that clearly identified which acts served as the basis for each crime charged:

> Here's what I want to be careful about. You've heard over the course of some evidence here that over the course of the episode, there may have been several threatening instances there. Threatened possible injury or otherwise when she was out in the garage or otherwise in the bedroom. The only episode that's really in contention for a [sic] what is legally an issue for the assault in the second degree or the assault in the fourth degree is what would or would not have happened with the knife. The other threats and

10

otherwise are relevant. They are relevant particularly for your consideration as to the unlawful imprisonment. The means by which he imprisoned her. The threats which would -- that had kept her there. But what I'm trying to get at here is those other -- in determining whether or not there was an assault 2 or the lesser, those other, the non-knife based instances, don't enter into your consideration for the assault count. So really what is the difference there? How could you find a lesser included if you are to consider that knife episode? Frankly, I think there would have to be a scenario where the evidence showed to you that he was threatening or stabbing the wall coming closer and closer but was not armed with a knife there at all.

Similarly, during Snyder's closing argument, Snyder's attorney made clear that the factual basis for the assault charge was only the incident involving the knife:

At the end of the day, you heard all this about hitting and slapping and smacking, and none of it really matters as far as the assault charge goes, because the prosecutor has charged the assault for the knife. So that's what matters. It doesn't matter whether Angela ran up the stairs, or she walked up the stairs. It doesn't matter if there was a baby gate blocking her way to run up the stairs or not. It doesn't matter. The only thing that matters is whether she was assaulted.
And the State essentially earlier said that, you know, if you can't find him not guilty or guilty of assault 2, then assault 4 is kind of the same thing, but they're not. If you look at them, assault 2 involves a deadly weapon, and assault 4 doesn't. There's a definition of a deadly weapon. And so if you decide that there was an assault with a knife, you have to decide whether the knife is a deadly weapon as defined by law. And that is why there are two different assaults.

Snyder contends that the State's election during closing argument was not clear because "the prosecutor did not argue the inverse to the jury: that it could not find Ms. Klemme was unlawfully imprisoned based on the incident with the knife."[1] We disagree. During closing argument, the State made a clear election

---

[1] Reply Br. of Appellant at 3.

that the incident involving the knife was not relevant to the charge of unlawful imprisonment. Again, the prosecutor stated:

> The only episode that's really in contention for a [sic] what is legally an issue for the assault in the second degree or the assault in the fourth degree is what would or would not have happened with the knife. *The other threats and otherwise are relevant. They are relevant particularly for your consideration as to the unlawful imprisonment. The means by which he imprisoned her. The threats which would -- that had kept her there.*

(Emphasis added.)

In this statement to the jury, the prosecutor distinguished between the evidence that the jury should consider for each count. Moreover, the record indicates that the only time that the prosecutor referenced any evidence of the stabbing incident during closing argument was when the prosecutor was discussing the assault charge. In particular, when discussing the evidence that supported the assault charge, the prosecutor played a portion of the audio recording of Klemme's statement that she made to police officers regarding the knife incident. There is no indication in the record that the prosecutor played this portion of the recording when discussing the unlawful imprisonment charge. Therefore, on this record, the State's election was clear.

Snyder also asserts that the jury instructions did not specify which charges were connected to which actions and, therefore, it is not manifestly apparent from the record which evidence the jury relied on for each conviction. However, when determining whether there was a double jeopardy violation, we review "'the entire record,'" not just the jury instructions. Mutch, 171 Wn.2d at 664 (quoting Noltie, 116 Wn.2d at 849). Additionally, when the State makes a clear election as to

12

which acts are relied upon for each conviction, a jury instruction to such an effect is not necessary. See Coleman, 159 Wn.2d at 511-12. As already explained, the State made such an election.

In sum, the convictions of unlawful imprisonment and assault in the fourth degree were based on different acts. Accordingly, entering judgment on these convictions did not result in a double jeopardy violation.

III

Snyder asserts that the trial court erred when it ruled that the two offenses of which he was convicted did not constitute the same criminal conduct for sentencing purposes. Because Snyder had a different objective criminal purpose for engaging in each crime, the sentencing court ruled properly.

We review the trial court's decision as to whether multiple offenses constitute the same criminal conduct for abuse of discretion. State v. Aldana Graciano, 176 Wn.2d 531, 535, 295 P.3d 219 (2013). This standard requires "a clear showing that the exercise of discretion was manifestly unreasonable, based on untenable grounds, or based on untenable reasons." State v. Horn, 3 Wn. App. 2d 302, 312, 415 P.3d 1225 (2018). Additionally, we may affirm the trial court's "ruling on any grounds adequately supported in the record." State v. Costich, 152 Wn.2d 463, 477, 98 P.3d 795 (2004). Because a finding by the sentencing court of same criminal conduct always favors the defendant, "it is the defendant who must establish the crimes constitute the same criminal conduct." Aldana Graciano, 176 Wn.2d at 539.

Crimes constitute the "same criminal conduct" when they "require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1). "'Intent, in this context, is not the particular *mens rea* element of the particular crime, but rather is the offender's objective criminal purpose in committing the crime.'" State v. Rattana Keo Phuong, 174 Wn. App. 494, 546, 299 P.3d 37 (2013) (quoting State v. Adame, 56 Wn. App. 803, 811, 785 P.2d 1144 (1990)). The legislature intended for the phrase "same criminal conduct" to be construed narrowly. State v. Flake, 76 Wn. App. 174, 180, 883 P.2d 341 (1994). Thus, if any one of the factors is not established, the multiple offenses do not constitute the same criminal conduct. State v. Lessley, 118 Wn.2d 773, 778, 827 P.2d 996 (1992).

Snyder's objective criminal purpose for committing each offense was not objectively the same. Snyder contends that his "objective criminal purposes for both the unlawful imprisonment and the fourth degree assault was the same: to intimidate Ms. Klemme in order to prevent her from leaving the house."[2] However, in the recorded statement to police officers, Klemme stated that, by stabbing the wall with the knife, Snyder was seeking to learn whether Klemme was "cheating" on him:

> When we were in there, he would stab the wall and tell me that, umm, if I didn't—because he thinks I'm sleeping with everybody. I cheated, and I have people over at my house all the time. Umm, anyways, he thinks that I am cheating, and he would ask me over and over and I told him the same thing all the time like, "No." And he would stab the wall. And he would tell me, if I don't tell him the truth, "It's going to get close to you." And he's like, "Go," you know, closer to where I was standing.

---

[2] Reply Br. of Appellant at 6.

In other words, Snyder's objective criminal purpose for committing the assault was not to intimidate Klemme in order to prevent her from leaving the house. Rather, Snyder's purpose was to discern whether Klemme was "cheating" on him.

However, the objective criminal purpose of Snyder's actions that constituted unlawful imprisonment was to prevent Klemme from leaving the house. After Snyder informed Klemme that she "wasn't leaving," Snyder and Klemme began to argue about whether she could leave the house in order to pick up her children. Over the course of several hours, Snyder engaged in a series of acts that had the effect of restricting Klemme's movements. These acts included (1) grabbing Klemme by the hair, hitting her, pulling her into the bedroom as she attempted to flee, and blocking the bedroom door, (2) throwing Klemme into the garage, pushing her onto the couch, and demanding that she stay seated, and (3) grabbing Klemme's right arm as she ran up the stairs with the youngest child in her left arm. These acts served the objective criminal purpose of preventing Klemme from leaving the house.

Because Snyder's objective criminal purpose in committing each crime was different, the trial court did not err by concluding that the two crimes did not constitute the same criminal conduct for sentencing purposes.

IV

Snyder contends that the trial court's order limiting his contact with his two children interferes with his right in the care, custody, and companionship of his children. This is so, he avers, because the limitations imposed by the order were

15

not reasonably necessary to serve a compelling state interest. Because the order was reasonably necessary to protect the children from harm, we disagree.

The Sentencing Reform Act of 1981, chapter 9.94A RCW, authorizes the trial court to impose "crime-related prohibitions" as a condition of a sentence. RCW 9.94A.505(9). A "crime-related prohibition" prohibits "conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). "[B]ecause the imposition of crime-related prohibitions is necessarily fact-specific and based upon the sentencing judge's in-person appraisal of the trial and the offender, the appropriate standard of review [is] abuse of discretion." In re Pers. Restraint of Rainey, 168 Wn.2d 367, 374-75, 229 P.3d 686 (2010). With regard to the imposition of a crime-related prohibition, the trial court abuses its discretion when "it applies the wrong legal standard." Rainey, 168 Wn.2d at 375.

"More careful review of sentencing conditions is required where those conditions interfere with a fundamental constitutional right." State v. Warren, 165 Wn.2d 17, 32, 195 P.3d 940 (2008). The right to the care, custody, and companionship of one's children is one such fundamental constitutional right. Rainey, 168 Wn.2d at 374. Thus, sentencing conditions burdening this right "must be 'sensitively imposed' so that they are 'reasonably necessary to accomplish the essential needs of the State and public order.'" Rainey, 168 Wn.2d at 374 (quoting Warren, 165 Wn.2d at 32). We have previously explained that "[p]revention of harm to children is a compelling state interest." State v. Ancira, 107 Wn. App. 650, 653-54, 27 P.3d 1246 (2001).

16

On March 19, 2020, the trial court entered a domestic violence no-contact order pursuant to chapter 10.99 RCW limiting Snyder's ability to contact Klemme and his two children. The trial court's order provided that Snyder "may have telephonic and video visitation . . . and in-person visitation at DOC if DOC permits." The no-contact order was set to expire five years after the date on which it was entered. The trial court imposed these conditions because it determined that the two children "appear to be victims" of domestic violence under chapter 10.99 RCW.

On this record, the limitations placed on Snyder's ability to contact his children were reasonably necessary to protect the children from harm. Under chapter 10.99 RCW, "victim" is defined as "a family or household member or an intimate partner who has been subjected to domestic violence." RCW 10.99.020(10).

The trial court did not err by determining that both of Snyder's children were victims of the domestic violence. In the recorded statement to police officers, Klemme described an incident where both children were put in direct harm by Snyder's actions:

> He grabbed my, grabbed me by the hair and threw me on the ground. From the bed to the ground. With my nine-month-old in my arms. And he was holding our two-year-old. And then proceeded to, I don't know where, what he was doing, he was hitting me. He didn't really hit me in the face, it was more. I had, well, I had my hands over my face when he was doing it. I try and protect the baby as well. And then I got back up and tried to run out the door. And he grabbed me and pulled me back on him as I ended up rolling over him and the two-year-old.

In addition to subjecting his children to domestic violence, Snyder also smoked methamphetamine in front of the children.

Moreover, a risk assessment of Snyder, which was prepared by a community corrections officer, stated:

> Jeffrey Snyder is a 33 year old violent, habitual offender with five previous felony convictions and 12 misdemeanor convictions including seven (7) domestic violence related crimes. His criminal history is indicative of a person with a criminal mindset, and violent tendencies made more severe by chronic drug and alcohol abuse. Snyder does not appear to be an appropriate candidate for sentencing under the [drug offender sentencing alternative]. An alternative sentence may not appropriately mitigate the risk he poses to his girlfriend, and to their children, by the high risk of re-offense he presents. Of particular concern is Snyder's failure to take responsibility for his actions, and for his vicious attacks against his girlfriend, with their children present, and causing her to fall repeatedly while she held a baby in her arms.

In light of Snyder's conduct toward Klemme and his children, as well as the risk assessment provided by the community corrections officer, the contact limitations imposed by the trial court were reasonably necessary to prevent harm to the children.[3]

Snyder's assignment of error fails.

---

[3] Snyder asserts that our opinion in Ancira necessitates a different outcome. Not so. In Ancira, the trial court found that the children were not victims of the father's acts of violence toward the mother, but rather mere witnesses to it. 107 Wn. App. at 653. The trial court entered an order prohibiting the father from engaging in any contact with the children for a maximum period of five years. Ancira, 107 Wn. App. at 653. We held that the trial court's entry of the no-contact order was not reasonably necessary to prevent the children from witnessing future acts of domestic violence. Ancira, 107 Wn. App. at 655. Here, however, the children themselves were victims of Snyder's acts of violence. Additionally, the trial court's order permitted Snyder to contact his children by way of telephonic and video visitations. Our holding in Ancira does not mandate that we decide this issue differently.

V

Snyder also contends that the trial court mistakenly ordered, as a condition of community custody, that he pay supervision fees as determined by the Department of Corrections. We agree.

RCW 9.94A.703(2) provides that "[u]nless waived by the court, as part of any term of community custody, the court shall order an offender to: . . . (d) Pay supervision fees as determined by the department." Because "the supervision fees are waivable by the trial court, they are discretionary [legal financial obligations]." State v. Dillon, 12 Wn. App. 2d 133, 152, 456 P.3d 1199, review denied, 195 Wn.2d 1022 (2020).

At sentencing, the trial court found Snyder to be indigent, imposed the mandatory $500 victim assessment and $100 DNA fee, and "waiv[ed] all other nonmandatory fines, fees, and assessments." However, the judgment and sentence signed by the judge required Snyder to "pay supervision fees as determined by DOC." Pursuant to Dillon, this requirement must be vacated on remand.

The convictions are affirmed.  The cause is reversed and remanded to the trial court to eliminate the requirement of payment of supervision fees.

_____
Dwyer, J.

WE CONCUR:

_____  _____
Coburn, J.                Bowman, J.