FILED
COURT OF APPEALS
DIVISION II

2013 APR 30 AM 8: 33

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 41357-4-II |
| Respondent/Cross-Appellant, | |
| v. | |
| SCOTT LINCOLN DAVIS, | PUBLISHED OPINION |
| Appellant/Cross-Respondent. | |

WORSWICK, C.J. — A jury convicted Scott Davis of attempted first degree murder and first degree assault, both with firearm enhancements, for engaging in a firefight with and wounding a sheriff's deputy. Davis appeals his convictions, arguing that (1) his convictions for attempted murder and first degree assault violated double jeopardy, (2) the firearm enhancement for his first degree assault conviction violated double jeopardy, (3) the jury instructions on the definition of "attempt" relieved the State of its burden to prove every element of attempted murder, (4) he received ineffective assistance of counsel when trial counsel failed to introduce evidence of his good and law abiding character, and (5) the jury instructions unconstitutionally failed to inform the jury of its power of nullification. The State cross-appeals, arguing that the trial court erred by finding that the attempted murder and first degree assault were the same criminal conduct for sentencing purposes. We affirm.

FACTS

Davis retired from the United States Army at the rank of major. Although he had a history of sub-clinical symptoms of mental illness, he completed a 20 year career in the military. He had his first psychotic break in 2005, when he abruptly quit his job and went to Bali where he spent his money impulsively and eventually came into conflict with the authorities, ending up in a Balinese mental institution.

After Davis returned from Bali, he received psychiatric medication. But in 2008, he had stopped taking his medications and his mental state deteriorated. Davis began to suffer from a number of delusions, including that society was about to collapse and people would turn to cannibalism, and that he would be sent to Guantanamo Bay and tortured if the military captured him. He also exhibited out-of-character behavior, including pressured speech that jumped from tangent to tangent, spending lavishly using credit cards that he had no intention of repaying, and building a tent city in a national forest for the upcoming collapse of society.

On January 18, 2009, Davis visited a grocery store where he behaved strangely. He told the clerk that he had a magical computer that could create universes, and that he could use it because he was the world's greatest graphic designer.

Davis told another of the grocery store clerks that he was looking for a place to stay, and the clerk told him about some cabins for rent nearby. Davis left the store and returned later, telling the clerk that he had "rangered" one of the cabins and did not need to contact the owners. A clerk sent word to the cabin owners, who called the sheriff's office about a possible trespass at the cabin.

On January 19, Clallam County Sheriff's Deputy William Cortani received and responded to the trespass call. Deputy Cortani went to the cabin to investigate and discovered that a sliding door leading to the cabin's deck was open. He drew his gun, planning to enter and clear the cabin, but as he was about to step over the threshold, Davis came around the corner of the cabin and asked if he could help the deputy.

Deputy Cortani identified himself and informed Davis that he was investigating a trespass. Davis responded that he was renting the cabin. Deputy Cortani told Davis that the cabin was supposed to be unoccupied and asked for Davis's identification. Davis said he was a retired major and "didn't have to listen to this." Report of Proceedings (RP) (July 26, 2010) at 89-90. Davis refused another command for identification and began to walk away from Deputy Cortani, going back around the corner. Deputy Cortani followed Davis, holstering his gun and drawing his stun gun, informing Davis that he was under arrest and telling him to put his hands on top of his head.

Davis started to put his hands up, but then glanced back and dropped his hands. Deputy Cortani saw Davis's hands go to his waist and grip the handle of a gun. Deputy Cortani discharged his stun gun, but Davis was not incapacitated. Davis then fired his gun at Deputy Cortani, hitting him in the arm.

Davis aimed the gun at Deputy Cortani's head; Deputy Cortani ducked and ran off the deck and down the beach from the cabin. Davis continued to fire as Deputy Cortani ran, hitting him in the hip. Deputy Cortani returned fire as he ran and took cover behind a log on the beach. He continued to return fire from there.

After 15 to 20 seconds, Davis stopped shooting and went into the cabin. Deputy Cortani moved along the log for better cover. Davis then returned from the cabin carrying a shotgun, moving toward and focused on the spot where Deputy Cortani had first gone over the log.

Deputy Cortani yelled to Davis to drop the weapon, but Davis brought the shotgun up, pointed it at Deputy Cortani, and Deputy Cortani started firing again. Davis ran forward and dove into a dip in the ground. Davis then raised the shotgun up and tossed it away, telling Deputy Cortani he was hurt and needed help. Deputy Cortani told Davis help was on the way, and he asked dispatch to send two ambulances.

The State charged Davis with attempted first degree murder and first degree assault, alleging firearm enhancements on both counts. Davis pleaded not guilty by reason of insanity.

Pretrial, the State moved the trial court to exclude any references to Davis's good character, such as the fact that he was an eagle scout, was a good family man, or was a decorated military veteran. The trial court ruled under ER 404(b) that evidence of Davis's general good character, such as his prior service in the army or the fact that he had been a good father, would be inadmissible. But the trial court permitted defense counsel to introduce specific facts regarding Davis's prior behavior to show whether there was any change due to his mental illness. Davis admitted such testimony through his sister Jennifer Davis and his cousin Mark Davis.

The State also moved to exclude any reference to jury nullification. Defense counsel objected but cited no law in support of his argument, calling his objection "more of a personal principal stand." Report of Proceedings (RP) (July 19, 2010) at 23. The trial court granted the State's motion and gave the jury instructions that it had a "duty" to return a verdict of guilty if the jury found the elements of the charged crimes proven beyond a reasonable doubt.

4

No. 41357-4-II

The jury rejected Davis's insanity defense, instead finding Davis guilty of attempted murder and first degree assault, both with firearm enhancements, as charged. At sentencing, however, the trial court found that the convictions were the same criminal conduct for sentencing purposes. Davis appeals his convictions; the State cross-appeals Davis's sentence.

ANALYSIS

I. DOUBLE JEOPARDY

Davis argues that his right to be free from double jeopardy was violated in two respects. First, he argues that his attempted murder and first degree assault convictions were for the same offense. And second, he argues that the firearm enhancement on the first degree assault charge violated double jeopardy. We disagree on both points.

We review a double jeopardy claim de novo. *State v. Freeman*, 153 Wn.2d 765, 770, 108 P.3d 753 (2005). The constitutional prohibition against double jeopardy forbids multiple punishments for the same offense. *State v. Kier*, 164 Wn.2d 798, 803, 194 P.3d 212 (2008).

*Freeman* sets forth the four-part framework for our double jeopardy analysis. 153 Wn.2d at 771-73. First, we search for express or implicit legislative intent to punish the crimes separately; if this intent is clear, then we look no further. *Freeman*, 153 Wn.2d at 771-72. Second, if there is no clear statement of legislative intent, then we may apply the "same evidence" test to the charged offenses.[1] *Freeman*, 153 Wn.2d at 772. Third, we may use the merger doctrine to discern legislative intent. *Freeman*, 153 Wn.2d at 772-73. Finally, if the two

---

[1] Washington's "same evidence" test is sometimes referred to as the "same elements" test or "the *Blockburger* test." *Freeman*, 153 Wn.2d at 772 (citing *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)).

offenses appear to be the same but each one has an independent purpose or effect, then the two offenses may be punished separately. *Freeman*, 153 Wn.2d at 773.

A.     *Convictions for First Degree Assault and Attempted Murder Did Not Violate Double Jeopardy*

The State concedes that Davis's attempted murder and first degree assault convictions are the same in law. But it argues that his crimes are not the same in fact because the assault was over when Davis committed the attempted murder. Because the State proved each crime with different evidence, the two crimes were not the same in fact for double jeopardy purposes. We thus agree with the State.

Under the "same evidence" test, if the crimes as charged and proved are the same in law and in fact, they may not be punished separately absent clear and contrary legislative intent. *Freeman*, 153 Wn.2d at 776-77 (citing *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)). Under this test, "[i]f each crime contains an element that the other does not, we presume that the crimes are not the same offense for double jeopardy purposes." *Freeman*, 153 Wn.2d at 772. But we do not consider the elements solely in the abstract; we consider the elements as the State charged and proved the offenses. *Freeman*, 153 Wn.2d at 777. Our Supreme Court has held that two crimes are not the same in fact if one crime

6

begins after the other is over, and thus different evidence supports each conviction.[2] *State v. Noltie*, 116 Wn.2d 831, 848, 809 P.2d 190 (1991) ("If one crime is over before another charged crime is committed, and different evidence is used to prove the second crime, then the two crimes are not the 'same offense' and a perpetrator may be punished separately for each crime without violating a defendant's double jeopardy rights.").

Here, the State relied on different evidence to prove each conviction. The offenses accordingly were not the same in fact. The State made clear at closing argument that it was relying on the initial shootout to support the assault charge and relying on the retrieval of the shotgun to support the attempted murder charge. Also, with regard to both crimes, the trial court instructed the jury: "[T]he State relies upon evidence regarding a single act or sequence of acts constituting the alleged crime. To convict the defendant . . . you must unanimously agree that the specific act or sequence of acts were proved beyond a reasonable doubt." Clerk's Papers (CP) at 174, 191. Thus, not only did the State explicitly rely on separate evidence to support each crime, the jury was instructed that it must unanimously agree that the specific sequence of acts relied on was proved beyond a reasonable doubt. As charged and proved, therefore, the crimes were not the same in fact.

---

[2] Davis argues that whether two offenses are the same in fact depends on the "unit of prosecution" for each crime, and that the unit of prosecution for assault has not been decided in Washington. Reply Br. of Appellant at 2; *see also* Br. of Appellant at 17 (citing cases relevant to the "unit of prosecution" test). But the "unit of prosecution" test is inapposite here. Our Supreme Court made clear in *State v. Adel*, 136 Wn.2d 629, 633, 965 P.2d 1072 (1998), that the *Blockburger* (same elements) test applies when a defendant is convicted under several different statutory provisions. The "unit of prosecution" test applies to multiple convictions under the *same* statute. *Adel*, 136 Wn.2d at 634. Davis was convicted under two different statutes and the unit of prosecution test does not apply.

Davis argues to the contrary, citing *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 818, 100 P.3d 291 (2004). But *Orange* supports the conclusion that there was no double jeopardy violation here.

In *Orange*, our Supreme Court held that in order to determine whether an attempt crime is the same offense as another crime, one must substitute the generic element of a "substantial step"[3] for the conduct used to prove the substantial step. 152 Wn.2d at 818. Orange was charged with both attempted murder and first degree assault for the same shot that hit the same victim. 152 Wn.2d at 814-15. Because the substantial step toward murder, shooting the victim, was the same evidence that proved the assault, the crimes were the same offense. 152 Wn.2d at 820.

Here, in contrast, there were two different acts with two different guns. The substantial step Davis took toward murdering Deputy Cortani was retrieving the shotgun and moving toward Deputy Cortani with the shotgun aimed at his last known position. This was not the same conduct as the initial firefight wherein Davis used a pistol to shoot Deputy Cortani. Davis's claim on this point fails.

B.      *Firearm Enhancement for First Degree Assault Did Not Violate Double Jeopardy*

Davis next argues that the firearm enhancement for his first degree assault conviction violated double jeopardy. Our Supreme Court decided this issue in *State v. Kelley*, 168 Wn.2d 72, 84, 226 P.3d 773 (2010), holding that there is no double jeopardy violation when a firearm

---

[3] A "substantial step" is an element of an attempt crime. RCW 9A.28.020(1) ("A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime.").

8

enhancement is added to a crime for which use of a firearm is an element. *Kelley* controls our decision on this issue and Davis's argument fails.

## II. SUBSTANTIAL STEP JURY INSTRUCTION

Davis next argues that the trial court relieved the State of the burden to prove every element of attempted murder because it gave an erroneous instruction on the definition of the term "substantial step." He argues that the instruction was erroneous (1) because it used the word "indicates" rather than "corroborates," and (2) because it did not instruct the jury that a substantial step must show the purpose to commit the specific crime charged. We disagree on both points.

"'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.'" *State v. Aguirre*, 168 Wn.2d 350, 363-64, 229 P.3d 669 (2010) (quoting *Keller v. City of Spokane*, 146 Wn.2d 237, 249, 44 P.3d 845 (2002)) (emphasis omitted) (internal quotation marks omitted). We review alleged error in jury instructions de novo. *State v. Sibert*, 168 Wn.2d 306, 311, 230 P.3d 412 (2010).

### A. *Use of Word "Indicates" Was Not Error*

Davis argues that the trial court erred by giving a jury instruction stating that a "substantial step" is conduct that "strongly indicates" a criminal purpose, rather than "strongly corroborates," relieving the State of its burden to show independent evidence of Davis's intent. Br. of Appellant at 21-22. Because the Supreme Court has not mandated use of the word "corroborates," and because there is no authority that the State must show independent evidence of intent, we disagree.

9

The trial court gave the jury *Washington Pattern Jury Instruction: Criminal* 100.05: "A substantial step is conduct that strongly indicates a criminal purpose and that is more than mere preparation." CP at 173; 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 100.05 at 390 (3d ed. 2008) (WPIC). But Davis argues that this instruction is erroneous because it differs from the language approved in *State v. Workman*, 90 Wn.2d 443, 451, 584 P.2d 382 (1978). The *Workman* court approved the instruction that a substantial step "must be strongly corroborative of the actor's criminal purpose." 90 Wn.2d at 452.

Davis argues that using the word "indicate" instead of "corroborate" relieved the State of the burden of providing independent, corroborating proof of Davis's intent. But *Workman* did not require that courts use the exact wording provided in that case. Rather, the *Workman* court held that "it would be *proper* for a trial court to include" language that a substantial step must be "strongly corroborative of the actor's criminal purpose." 90 Wn.2d at 452 (emphasis added). The *Workman* court did not hold that such an instruction was mandatory, let alone that it must be given in those exact words.

In fact, the trial court in *Workman* instructed the jury only that a substantial step must be more than mere preparation, without mentioning that the conduct should indicate or corroborate a criminal purpose. 90 Wn.2d at 449. The *Workman* court upheld this instruction as proper. 90 Wn.2d at 449. A trial court does not err by failing to use the exact language approved in *Workman* because *Workman* itself upheld the failure to use such language.

Moreover, Davis cites no legal authority for his argument that the instruction here relieved the State of its burden to provide "some independent evidence of intent, which must

then be corroborated by the accused's conduct" (nor does he attempt to explain what this proposition means, as a practical matter). Br. of Appellant at 21-22. Davis's only authority on this point is a dictionary definition of the word "corroborate." Davis uses this definition, in conjunction with *Workman*, to effectively add a new element to all attempt crimes. But no Washington court has recognized such an element, nor does *Workman* support Davis's reading of it.

Not only is Davis's proposed "independent evidence" element unsupported by any legal authority, it contradicts settled Washington case law regarding evidence of intent. Washington law holds that the intent to commit a crime may be inferred "if the defendant's conduct and surrounding facts and circumstances plainly indicate such intent as a matter of logical probability." *State v. Cordero*, 170 Wn. App. 351, 368, 284 P.3d 773 (2012). No authority suggests that an exception to this general rule exists for attempt crimes. Davis's argument on this point accordingly fails.

B.     *Use of Words "A Criminal Purpose" Was Not Error*

Davis also argues that the substantial step instruction was erroneous because the instruction required that a substantial step indicate "a criminal purpose," relieving the State of its burden to show that Davis intended to commit the crime charged, as opposed to some other crime. Because the jury instructions as a whole made clear that the substantial step had to be toward first degree murder, we disagree.

Davis relies on *State v. Roberts*, 142 Wn.2d 471, 14 P.3d 713 (2000), for this argument, but *Roberts* is inapposite. In *Roberts*, the trial court instructed the jury that a person was accountable for the conduct of another when the person was an accomplice in the commission of

11

"a crime." 142 Wn.2d at 510. The court held that this was error; an accomplice must have knowledge of the crime he or she is charged with aiding, not merely knowledge of "a crime." 142 Wn.2d at 513. Such an instruction effectively removed the mens rea of "knowingly" from accomplice liability, erroneously making an accomplice strictly liable for crimes of which he had no knowledge. 142 Wn.2d at 510-11.

The substantial step instruction here similarly stated that a substantial step must strongly indicate "a criminal purpose," rather than the specific criminal purpose of committing first degree murder. But we do not review the adequacy of jury instructions in isolation; we review the jury instructions as a whole. *State v. Prado*, 144 Wn.2d 227, 240, 181 P.3d 901 (2008). And the "to convict" instruction for attempted first degree murder made clear that the substantial step had to be toward first degree murder, rather than toward an unspecified crime.

According to the attempted first degree murder "to convict" instruction, to find Davis guilty, the jury had to find that "the Defendant did an act that was a substantial step toward the commission of MURDER IN THE FIRST DEGREE." CP at 172. The jury was further required to find that "the act was done with the intent to commit MURDER IN THE FIRST DEGREE." CP at 172. Reading the instructions as a whole, there is no danger that the jury believed that Davis's substantial step had to indicate only the purpose to commit any crime, as opposed to the specific crime of first degree murder. This stands in contrast to *Roberts*, in which there was apparently no instruction clarifying that Roberts had to have knowledge of the crime charged. 142 Wn.2d at 510-11.

We reached a similar conclusion in *State v. Eplett*, 167 Wn. App. 660, 666, 274 P.3d 401 (2012). There, Eplett made the same argument that Davis makes now, although premised as an

ineffective assistance of counsel claim for the failure to object to a WPIC 100.05 instruction. 167 Wn. App. at 666. We held that counsel was not ineffective for failing to object to the WPIC 100.05 instruction because the jury instructions as a whole were sufficient. 167 Wn. App. at 666. Just as here, the jury instructions in *Eplett*, read as a whole, informed the jury that it must find that the substantial step was taken toward the crime charged. 167 Wn. App. at 666. Davis's argument on this point fails.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Davis next argues that he received ineffective assistance of counsel based on trial counsel's failure to introduce available evidence of his good character. We disagree.

We review an ineffective assistance of counsel claim de novo as a mixed question of law and fact. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). In order to show ineffective assistance of counsel, Davis must show (1) that defense counsel's conduct was deficient, and (2) that the deficient performance prejudiced him. *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). To show deficient performance, Davis must show that defense counsel's performance fell below an objective standard of reasonableness. *Reichenbach*, 153 Wn.2d at 130. To show prejudice, Davis must show a reasonable possibility that, but for counsel's purportedly deficient conduct, the outcome of the proceeding would have differed. *Reichenbach*, 153 Wn.2d at 130. Because both prongs must be met, a failure to show either prong will end the inquiry. *State v. Fredrick*, 45 Wn. App. 916, 923, 729 P.2d 56 (1986).

To prevail on his ineffective assistance claim, Davis "must overcome 'a strong presumption that counsel's performance was reasonable.'" *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). Davis

can rebut the presumption of reasonable performance by showing that "'there is no conceivable legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 33 (quoting *Reichenbach*, 153 Wn.2d at 130).

Deciding whether to call a witness is a matter of legitimate trial tactics that presumptively does not support a claim of ineffective assistance of counsel. *State v. Byrd*, 30 Wn. App. 794, 799, 638 P.2d 601 (1981). A defendant can overcome this presumption by showing that counsel failed to adequately investigate or prepare for trial. *Byrd*, 30 Wn. App. at 799. Davis has made no such showing here. Quite the opposite—counsel called two witnesses who testified as to Davis's prior good character, within the bounds of the trial court's ruling on the motion in limine.

Defense counsel called Davis's sister, Jennifer Davis, who testified that she used to visit Davis every summer and that his family was "very normal." RP (July 28, 2010) at 20. Jennifer[4] testified, "He was a family man. He was into his family. He was my oldest brother. He was normal." RP (July 28, 2010) at 20. Jennifer also testified that Davis stole from her after his mental status deteriorated, which he "[n]ever, never, never" would have done before. RP (July 28, 2010) at 36. She further testified that Davis's reckless spending with credit cards was out of character for him and that he had always been responsible with money before.

Davis's cousin, Mark Davis, testified that while Davis was irritable after his mental status deteriorated, he had previously been friendly, outgoing, and happy, but not irritable. Mark also testified that Davis stayed in his parents' living room at one point and "trashed" it, although he previously practiced military standard cleanliness.

---

[4] We refer to witnesses Jennifer Davis and Mark Davis by their first names for clarity, intending no disrespect.

This evidence was uncontroverted—there was no evidence that Davis had been violent or a lawbreaker or otherwise unpleasant in any way before the onset of his severe mental illness. It was also uncontroverted that Davis was suffering from severe bipolar disorder during the incident. Although further evidence of Davis's past conduct could have emphasized the extent to which his bipolar disorder changed his personality and behavior, trial counsel exercised legitimate trial tactics by electing to call just two witnesses on the subject, rather than present cumulative evidence regarding undisputed facts. Davis's claim on this point fails.

## IV. NULLIFICATION

Davis next argues that the trial court violated his right to a jury trial by failing to instruct the jury as to its powers of nullification. We have previously decided this issue, and Davis's claim fails.

The trial court here instructed the jury that it had a "duty" to convict if it found the elements of the charged crimes proved beyond a reasonable doubt. Davis argues that under article I, section 21 of the Washington Constitution, juries have no such duty, and this instruction was accordingly unconstitutional.

We unequivocally rejected Davis's argument in *State v. Brown*, 130 Wn. App. 767, 770-71, 124 P.3d 663 (2005). And although Davis argues that *Brown* was erroneous, he makes this argument only in passing. Passing treatment of an issue is insufficient to warrant appellate consideration and we do not address Davis's argument that *Brown* should be reconsidered. *State v. Thomas*, 150 Wn.2d 821, 868-69, 83 P.3d 970 (2004). Davis's argument fails.

## V. SAME CRIMINAL CONDUCT

Finally, in its cross appeal, the State argues that the trial court abused its discretion by ruling that Davis's assault and attempted murder convictions were the same criminal conduct for sentencing purposes. We disagree because the State has not met its burden to show an abuse of discretion.

Under RCW 9.94A.589(1)(a), offenses that constitute the same criminal conduct are treated as one crime for sentencing purposes. Offenses are the same criminal conduct if they require "the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a). Courts generally construe these requirements narrowly "to disallow most claims that multiple offenses constitute the same criminal act." *State v. Porter*, 133 Wn.2d 177, 181, 942 P.2d 974 (1997).

We review a trial court's determination of whether two acts constituted the same criminal conduct for abuse of discretion. *State v. French*, 157 Wn.2d 593, 613, 141 P.3d 54 (2006). A trial court abuses its discretion when it relies on unsupported facts, applies the wrong legal standard, or adopts a view that no reasonable person would take. *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003). The appellant bears the burden to prove an abuse of discretion. *State v. Asaeli*, 150 Wn. App. 543, 573, 208 P.3d 1136 (2009).

There is no question that the crimes here involve the same victim, nor does the State contest that the crimes occurred at the same time. *See Porter*, 133 Wn.2d at 182-83 (holding that sequential crimes need not be simultaneous to occur at the same time for same criminal conduct purposes). But the State argues that the trial court abused its discretion by failing to find that the

crimes here occurred at different places and encompassed different criminal intent. Again, we disagree.

A.    *Same Criminal Intent*

As to the issue of same criminal intent, the State points out that first degree assault requires the intent to inflict great bodily harm, and attempted murder requires the intent to kill. But the Court of Appeals has recognized that "intent" in this context does not mean the mens rea required for the crime, but the defendant's "objective criminal purpose in committing the crime." *State v. Adame*, 56 Wn. App. 803, 811, 785 P.2d 1144 (1990).

Here, the trial court found that Davis's intent between the two crimes was the same: to kill Deputy Cortani. The State argues that this finding was erroneous because it was not established beyond a reasonable doubt that Davis intended to kill Deputy Cortani during the initial assault. But the standard to determine same criminal conduct is not beyond a reasonable doubt. The record does not show that the trial court erred in finding that Davis intended to kill Deputy Cortani throughout both crimes.

The record shows that Davis aimed his pistol at Deputy Cortani's head immediately after shooting him in the arm. Davis continued to fire even after Deputy Cortani was wounded and running away. And according to a volunteer emergency medical technician, Davis said something to the effect that he would have killed Deputy Cortani if his pistol had not jammed or run out of ammunition. The record does not show that the trial court abused its discretion on this point.

B.     *Same Place*

As to the issue of same place, the State points out that the initial assault occurred approximately 50 feet away from the attempted murder. We hold that the State has not shown that the trial court abused its discretion in finding that the crimes occurred at the same place.

The only case to squarely confront the same place requirement is our decision in *State v. Stockmyer*, 136 Wn. App. 212, 219-20, 148 P.3d 1077 (2006). There, we construed the same place requirement narrowly and held that Stockmyer's possession of multiple guns in different rooms of his home constituted possession in different places for the purposes of a same criminal conduct analysis. 136 Wn. App. at 219-20. We held, "[W]e cannot say as a matter of law that Stockmyer's possession of multiple firearms in these three different locations constituted the same criminal conduct." 136 Wn. App. at 219. Instead, we looked to the specific facts of the case to resolve this issue. 136 Wn. App. at 219-20. So too here, we cannot say as a matter of law that the locations involved were the same place for same criminal conduct purposes. Where the trial judge, based on the specific facts of the case, has determined that the crimes occurred at the same place, we will not reverse this decision absent an abuse of discretion.

Here, the initial assault occurred on the cabin's deck and as Deputy Cortani ran along the beach to take cover. The attempted murder occurred inside the cabin where Davis obtained the shotgun to use to kill Deputy Cortani, and on the beach where Davis advanced toward Deputy Cortani to carry out his plan. The trial judge was in the best position to evaluate the sequence of events and to determine whether these locations were separate places for the purposes of the same criminal conduct analysis. Where, as here, the different physical locations are adjacent and

18

No. 41357-4-II

within a short distance of each other, we cannot say that the trial court abused its discretion by finding them to be the same place.

The State has not demonstrated that the trial court abused its discretion in this regard. Because the State has not met the burden to show such an abuse of discretion, we affirm the trial court's ruling that the crimes were the same criminal conduct for sentencing purposes.

Affirmed.

Worswick, C.J.

We concur:

Quinn-Brintnall, J.

Van Deren, J.

19