# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54383-4-II |
| Respondent, | |
| v. | |
| MICHAEL DAVID HOLLIDAY, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Michael David Holliday was convicted of second degree murder after a medical examiner and several doctors determined that abusive head trauma caused the death of an 11-month-old child in Holliday's care. Holliday appeals his conviction, arguing the trial court violated his right to present a defense when it excluded evidence of his reputation for peacefulness and his prior experience caring appropriately for young children. Holliday also argues his trial counsel was constitutionally ineffective because counsel failed to call a second medical expert witness.

We hold that the trial court did not violate Holliday's right to present a defense. The trial court did not abuse its discretion when it excluded evidence of Holliday's reputation for peacefulness and prior childcare experience, and Holliday was able to present evidence to support his theory of the case. Holliday also fails to show that his trial counsel's performance was deficient because the expert witness in question changed his opinion significantly before trial, subjecting him to impeachment. We affirm.

FACTS

One evening in June 2017, Holliday was babysitting KP. Holliday had been dating KP's mother for a few months. Occasionally, Holliday kept KP overnight so that KP's mother could study and sleep. On the night prior to this incident, KP was in Holliday's sole care.

The next morning, medical personnel responded to a 911 call from Holliday reporting that KP was unresponsive. KP was hospitalized, but he never recovered. He died a few days later.

The Pierce County Medical Examiner performed an autopsy of KP and concluded that KP's death was caused by "blunt force injury to the head," which "may have included shaking, striking the head against a stationary object, or both," although he believed shaking was the "more likely" cause of death. 3 Verbatim Report of Proceedings (VRP) at 588. The medical examiner explained that KP's acute subdural hematomas, retinal hemorrhages, and lack of an impact point on the scalp or skull caused him to be "close to a hundred percent" certain KP's injuries were the result of shaking. *Id.* at 589. He determined that KP's manner of death was homicide.

The State charged Holliday with second degree murder, alleging that he committed or attempted to commit first degree assault of a child and, "in the course of and in furtherance of" the assault, caused KP's death. Clerk's Papers (CP) at 184. The State added an aggravating circumstance that Holliday knew or should have known that the victim was "particularly vulnerable or incapable of resistance." CP at 185.

I. THEORIES OF THE CASE

A.      The State's Theory

The State relied on the opinions of numerous medical professionals, including pediatricians, emergency room physicians, intensivists, and pathologists, who concluded that KP's

injuries were consistent with abusive head trauma. For example, Dr. Yolanda Duralde, the former Director of the Child Abuse Intervention Department at Mary Bridge Children's Hospital, testified that "the most common injuries that reflect abusive head trauma are subdural hemorrhages; no other external findings, so no contact injuries; and severe retinal hemorrhages." 2 VRP at 334.

KP's injuries included bilateral subdural hemorrhages, meaning bleeding outside of the blood vessels in his brain on both the right and left sides, as well as severe retinal hemorrhages, meaning bleeding outside of the blood vessels in the tissue at the back of his eyes. He did not have any external injuries to his scalp or skull that would have been consistent with bumping or falling on his head. "[T]his constellation or all of these findings together usually show that the child was likely shaken." 3 VRP at 507.

Several of the medical professionals explained that a "sudden acceleration-deceleration of the brain tissue," or "shearing forces," can damage brain tissue and break neuronal connections, as well as cause bleeding. 2 VRP at 268. Shearing forces can cause small veins within the brain to break, and the broken veins may cause subdural hemorrhages. The cause of a "subdural hemorrhage is almost always traumatic," 3 VRP at 577, so its presence makes the "suspicion for a traumatic event much higher," 2 VRP at 279.

Shearing forces may also cause hemorrhaging from the "fragile" vessels in the retina. 3 VRP at 637. "There's really nothing else that causes widespread, multiple layered retinal hemorrhages except for the forces that you see in shaking." 2 VRP at 364; *see also* 3 VRP 509 ("The more hemorrhages, the more layers involved, the larger area makes it much more likely that it was from abuse."). A finding of multiple retinal hemorrhages is considered "very consistent with traumatic brain injury and shaken baby" and "extremely indicative of inflicted child trauma." 2

VRP at 276; 3 VRP at 637. An ophthalmologist who testified for the State said that the degree of damage in KP's eyes was "probably in the top 5 percent" of cases he had seen and that, in his opinion, the damage was "almost certainly caused by inflicted trauma, specifically shaken infant." 3 VRP at 643, 646.

Additionally, "the jelly part of the eye" that is against the retina "can pull on the retina" as it is shaken back and forth. *Id.* at 637-38. This movement will "pull up the retina in a circular fold that envelops the central retina back pole. These are called choroidal folds. They're highly suggestive of inflicted trauma." *Id.* at 638. KP had choroidal folds in both eyes. KP showed all of these indicators of having been violently shaken.

B.      Holliday's Theory

Holliday maintained that he did not violently shake KP. He told one of the responding officers that KP "seemed to have fainted" and that after KP dropped his bottle, Holliday "couldn't wake him up." 1 VRP at 28. Holliday said that "he picked [KP] up and shook him," and "at one point he splashed water on the child's face to try to wake him up, and it didn't work." *Id.* Holliday consistently described what happened both to another responding officer and later in a formal interview. *See, e.g.*, *id.* at 130 (reporting to another responding officer that KP "had just fallen over"). The only significant departure in Holliday's formal interview was when he said, "It was not really a . . . I don't want to say shake. It wasn't a shake. It was more like a [']are you up['] kind of thing." CP at 147.

To explain KP's death, Holliday relied on an abnormal autopsy finding that KP had a superior sagittal sinus thrombosis. A thrombus is a blood clot, and the superior sagittal sinus is a blood vessel that "sits on top of the brain" and "collects blood to return it to the heart." 3 VRP at

583. A blood clot in the brain is "uncommon," but it may develop due to an infection or dehydration that affects "the composition of the blood." 4 VRP at 854-55.

Holliday's expert witness, Dr. Kris Sperry, described a thrombus as "an actual process," similar to "bricklayers building a wall . . . one layer at a time" that could eventually "interrupt or block the blood flow." *Id.* at 850. He explained, "Any type of infection[,] such as pneumonia, . . . can lay the groundwork for the blood to be abnormal or changed enough such that this thrombus will start to form and grow." *Id.* at 855. He theorized the blood clot began to develop at least a few days prior to KP's collapse because there were some medical reports indicating KP "had a fever for three days before this event and had been vomiting." 5 VRP at 939. Additionally, the receiving emergency room physician suspected KP was septic, which he explained as suffering from "an overwhelming infection." 2 VRP at 440. However, Sperry could not determine precisely when the blood clot started forming because the oldest part of it, "the root . . . where this thing started to grow from," was not examined during the autopsy. 4 VRP at 856.

Sperry argued that the clot grew and put pressure on the small veins in KP's brain and ultimately caused them to break. He opined that this caused subdural bleeding, that the subdural bleeding caused a rapid rise in intracranial pressure, and that the rapid rise in intracranial pressure caused KP to suddenly lose consciousness and stop breathing. He believed that after the clot blocked the blood flow to KP's brain and caused him to stop breathing, KP's brain cells died from the lack of oxygen. Sperry also connected the blood clot to KP's retinal hemorrhages, saying, "[J]ust about anything that results in bleeding inside the brain or on the surface of the brain or

causes . . . the pressure inside of the skull on the brain to increase, that will result in retinal hemorrhages." 5 VRP at 904.[1]

## II. *FRYE* HEARING REGARDING DR. LEFKOWITZ'S TESTIMONY

The State filed a *Frye*[2] motion to exclude the testimony of Dr. Todd Lefkowitz, an ophthalmologist whom the defense wanted to call as an expert witness. The State argued that, as an ophthalmologist, Lefkowitz was not qualified to discuss any "neurological findings or speculation about whether or not a thrombosis was or was not present" in KP's brain prior to his death, as well as whether the thrombosis could have caused the retinal damage and choroidal folds that occurred in KP's eyes. VRP (Dec. 16, 2019) at 113.

At an evidentiary hearing, Lefkowitz admitted that the degree of retinal hemorrhaging seen in this case is "mostly associated with nonaccidental head trauma." *Id.* at 54. He explained, however, that he "can't rule . . . out" the theory of a blood clot causing the retinal hemorrhages in KP's eyes. *Id.* at 55. He testified that based on the "clinical picture, the history, [and the medical] findings," he did not believe KP suffered from abusive head trauma. *Id.* at 58.

On cross-examination at the *Frye* hearing, the State brought up that during an earlier interview, Lefkowitz had indicated his opinion was "it was 80 to 90 percent probable that this

---

[1] The State's witnesses generally maintained that the blood clot was not present when KP first arrived at the hospital. The neuropathologist who examined KP's brain after his death theorized that because the clot was attached to the inside of the superior sagittal sinus, it was "probably caused by endothelial damage within the sagittal sinus," meaning damage to "the lining of [the] vessel," which could have been caused by "physical trauma to the head." 5 VRP at 1004-06.

[2] *Frye v. United States*, 293 F. 1013, 1014, 54 App. D.C. 46 (1923) (holding that before scientific expert testimony may be admitted, the science "must be sufficiently established to have gained general acceptance in the particular field in which it belongs").

injury *was* from abusive head trauma." *Id.* at 61-62 (emphasis added). Lefkowitz acknowledged making that statement. When the State asked why he gave this opinion in an earlier interview, Lefkowitz responded that he "didn't know it was going to be an examination," he "was unprepared at that time" and "hadn't reviewed all the records," and he was "caught . . . off guard." *Id.* at 62.

Lefkowitz explained that after further review of the reports from other doctors, "there was not, in [his] mind, conclusive evidence that the findings were related to head trauma or shaking." *Id.* at 63. After reviewing Holliday's interview and KP's medical history, Lefkowitz believed that the facts "didn't all indicate a high degree of connection with a traumatic event." *Id.* He concluded that at the time of the *Frye* hearing, he was "90 percent certain that [abusive head trauma] was not the situation in this patient" and that KP had "some kind of medical condition which led to the sinus thrombosis, which, in turn, led to all the findings on the retinal exams." *Id.* at 65. The trial court characterized this as a 180-degree change. *Id.* However, the trial court indicated that it would deny the State's *Frye* motion and allow Lefkowitz to testify at trial.

### III. MOTIONS IN LIMINE

#### A. Reputation for Peacefulness

Holliday moved in limine to allow testimony regarding his reputation for peacefulness. Specifically, Holliday proposed that "a childhood friend" who had known Holliday "for some time" and "knew the same people [as Holliday] through playing sports together and growing up together" would testify to Holliday's "nonviolent reputation among those who knew and [were] associated with [Holliday] in some way." CP at 169. Holliday argued that this evidence was relevant to whether he intended to cause bodily harm.

7

The trial court explained that this reputation testimony needed to come from "someone in the community who is not so intimately connected with" Holliday. VRP (Jan. 8, 2020) at 82. It also raised the concern that a childhood friend may not be able to provide pertinent reputation testimony because how Holliday "was as a child may be entirely different than how he is as an adult." *Id.* at 85. It ultimately concluded, "I will reserve on [this motion], pending some proffer" or "some information as to what the testimony may be." *Id.* at 85-86. The trial court clarified, "If it's about his reputation for peacefulness when he was a child, that's not going to be pertinent;" his current reputation was the pertinent issue. *Id.* at 86. The record does not show that Holliday ever proffered any specific testimony or asked the trial court to revisit this motion.

B.     Experience Caring for Young Children Appropriately

Holliday also moved in limine to "allow testimony regarding [his] experience and training in handling and appropriate care taking skills of young children." CP at 166. Specifically, he wanted to introduce evidence of his "vast experience of handling and providing care to infants of [KP's] age and older," including his experience raising his own children and his experience assisting his mother when she ran a day care. CP at 167. Holliday explained that in cases alleging abusive head trauma, the scenario typically implied is of an infant "uncontrollably crying" and a caretaker shaking the infant "out of frustration or a lack of patience." *Id.* Thus, evidence that when caring for children in the past, Holliday had "acted appropriately and never mistreated them when they acted out" would be "highly relevant" to rebut any inference that Holliday did not "know how to handle a crying infant and somehow lost control shaking [KP]." CP at 167-68. Holliday argued this was evidence of his experience, not evidence of a particular character trait.

The State moved in limine to exclude evidence describing Holliday as "a 'good father', 'good with kids', [or] generally a good person" as inadmissible character evidence. CP at 37. The State argued Holliday "would like the jury to conclude that based on his prior behavior, he is not the type of person that would murder a baby. That type of evidence is exactly what is intended to be governed by ER 404," the rule governing character evidence. CP at 50. The State asserted that Holliday failed to meet the requirements of ER 404.

The State's memorandum listed Holliday's anticipated witnesses and summarized their expected testimony. The list consisted of family members, such as Holliday's mother, former stepfather, and ex-wife with whom he shares his children, as well as Holliday's friends and one co-worker. Most of the witnesses were expected to testify that they had seen Holliday interact with children on other occasions and that he "acts appropriately." CP at 43. During interviews with the State, many of the proposed witnesses expressed their opinion that "based on their observations, [Holliday] was good with children and was slow to anger." CP at 46.

The trial court concluded that the proffered evidence was character evidence because it showed Holliday's "tendency with respect to children when they get fussy." VRP (Jan. 8, 2020) at 81. It was Holliday's "attempt to indicate that, because I've never acted that way before, I couldn't have acted that way on that specific date." *Id.* at 80.

The trial court further noted that character evidence needs to be offered as reputation evidence from members of "a neutral community." *Id.* at 81. As an example, it suggested that the court may be able to consider testimony of "people who had children at [Holliday's] mother's day[]care." *Id.* at 75. But because the proposed witnesses were all "very closely linked with" Holliday, the trial court determined they were not members of a sufficiently neutral community.

9

*Id.* at 81. It ruled, "[A]t this time I'm going to rule that these people should not be able to come in and testify as to . . . his tendencies with regard to children." *Id.* at 78. The trial court advised Holliday, "[I]f there were some neutral parties that you were going to proffer, that might change how the Court looks at it." *Id.* at 80. The trial court did not restrict any testimony about Holliday's interactions with KP specifically. The record does not show that Holliday ever proffered testimony from other witnesses or asked the trial court to revisit this motion.

## IV. TRIAL

At trial, the State called 4 law enforcement officers who either responded to Holliday's 911 call or investigated the case, 11 medical professionals who examined KP either before or after his death, and KP's mother and great-grandmother. The law enforcement officers and medical professionals testified consistent with the facts described above.

KP's mother testified that she did not previously have any concerns about Holliday watching KP. She had seen Holliday interact with her other kids, as well as his own kids, and he was "good with them." 1 VRP at 231. She agreed that Holliday was "good with [KP]" and that she "never saw [Holliday] lose patience or get angry or discipline the children in any way." *Id.* at 231-32. KP's great-grandmother similarly testified that she had briefly seen Holliday interact with KP and had not seen anything that concerned her. He played with KP appropriately and carried him appropriately, and KP seemed comfortable with Holliday.

KP's mother also testified that KP had been hospitalized for pneumonia several months prior, but he had recovered by June 2017. In the days leading up to the incident, she said, "He was fine. There was nothing wrong with him." *Id.* at 219. She later recalled telling the officers that KP had not been feeling well because he was teething. But she did not recall him throwing up a lot or

seeming dehydrated. KP's great-grandmother also said that there was "nothing unusual going on with him" before he died and that he did not seem sick. 4 VRP at 682.

During cross-examination of the State's witnesses, Holliday referred to a note from Harrison Medical Center's records that "'the child has had fever and nonproductive cough for three days'" and may have been vomiting. 2 VRP at 304. He indicated KP was sick for a few days prior to his death to suggest that an illness could have triggered the development of a blood clot. He also suggested the clot did not appear on KP's initial intake scans because doctors did not perform the appropriate tests to highlight it.

Holliday called two witnesses—Dr. Sperry and a detective. Sperry testified consistently with his opinions described above. He concluded that thrombosis likely caused KP's death and insisted that the blood clot "really is the crux of everything." 5 VRP at 947.

The sole purpose of the detective's testimony was to impeach KP's mother's credibility. KP's mother had testified that she did not recall telling the detective that KP had been sluggish in the days preceding his death. The detective testified that KP's mother told him KP had been "kind of sluggish." 6 VRP at 1108. Holliday did not call Dr. Lefkowitz as a witness.

The State began its closing argument by stating, "With great power comes great responsibility." *Id.* at 1126. It argued Holliday had the responsibility of caring for KP, but "he reached his breaking point." *Id.* When Holliday called 911, he was the only person with KP. "There's nobody else there." *Id.* at 1131.

During Holliday's closing argument, his counsel told the jury, Holliday "has his own kids, so he knows how to deal with children." *Id.* at 1229. Counsel reiterated testimony from KP's mother that she "never saw [Holliday] lose his temper" or "do anything to those kids that shouldn't

be done." *Id.* at 1228. He argued, "There's nothing here to suggest that . . . he's a temperamental person or that he wouldn't know how to [care for children] or he wouldn't know how to handle himself." *Id.* at 1229. "Typically, in these shaken baby cases, the scenario which they alluded to, some baby cries, they get out of hand, and you lose it, and you snap. There's nothing here to even remotely suggest that at all." *Id.*

The jury found Holliday guilty of second degree murder, and it found that Holliday knew or should have known the victim was particularly vulnerable. Holliday appeals his conviction.

## ANALYSIS

### I. RIGHT TO PRESENT A DEFENSE

The right to present a defense is constitutionally guaranteed to all criminal defendants. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Duarte Vela*, 200 Wn. App. 306, 317, 402 P.3d 281 (2017).[3] Whether the constitutional right has been violated is a legal question that we review de novo. *State v. Arndt*, 194 Wn.2d 784, 797, 453 P.3d 696 (2019). However, we review the trial court's specific evidentiary rulings for abuse of discretion. *Id.*

A.      Evidentiary Rulings

1.      Reputation for peacefulness

Holliday argues the trial court violated his right to present a defense when it excluded evidence of his reputation for peacefulness because the evidence was "relevant to the crime charged," had "high probative value," and "would have made the State's theory less probable."

---

[3] Holliday cites the Washington Constitution in his assignments of error, but he does not present a separate state constitutional analysis or argue for greater protections under the state constitution.

Opening Br. of Appellant at 24-25. We hold Holliday waived any error by failing to preserve this claim below.

A party cannot appeal a ruling excluding evidence unless they made an offer of proof advising the trial court of the witness's expected testimony. ER 103(a)(2); *State v. Song Wang*, 5 Wn. App. 2d 12, 26, 424 P.3d 1251 (2018). On appeal, "we evaluate the court's analysis *of the proof offered.*" *State v. Ortuno-Perez*, 196 Wn. App. 771, 788 n.6, 385 P.3d 218 (2016) (emphasis added). The "'offer of proof must be sufficiently definite and comprehensive fairly to advise the trial court whether or not the proposed evidence is admissible.'" *Song Wang*, 5 Wn. App. 2d at 26-27 (quoting *Sutton v. Mathews*, 41 Wn.2d 64, 67, 247 P.2d 556 (1952)).

When the trial court issues a final ruling on a motion in limine, the losing party has a standing objection. *State v. Dillon*, 12 Wn. App. 2d 133, 146-47, 456 P.3d 1199, *review denied*, 195 Wn.2d 1022 (2020). But when the trial court does not "directly rule against" a motion, instead reserving its ruling, and "counsel fail[s] to bring the matter to the attention of the court again, any alleged error is waived." *Wagner v. Wagner*, 1 Wn. App. 328, 332, 461 P.2d 577 (1969); *see also State v. Powell*, 126 Wn.2d 244, 257, 893 P.2d 615 (1995) (explaining that where the trial court reserved a ruling, trial counsel needed to "provide further support" to preserve the alleged error for appeal); *Dillon*, 12 Wn. App. 2d at 147 ("When a ruling is tentative, 'any error in admitting or excluding evidence is waived unless the trial court is given an opportunity to reconsider its ruling.'" (quoting *Powell*, 126 Wn.2d at 257)).

When the trial court considered Holliday's motion in limine to admit testimony about his reputation for peacefulness, it reserved its ruling, explaining that it would need "a proffer of testimony as to what [the witness is] going to say." VRP (Jan. 8, 2020) at 85; *see also id.* at 85-86

("I'm reserving, pending getting some information as to what the testimony may be."). The record does not show that Holliday ever provided the trial court with a proffer of actual testimony or raised this issue again. Therefore, we hold that Holliday waived any alleged error.

The trial court did state, "If [the testimony is] about [Holliday's] reputation for peacefulness when he was a child, that's not going to be pertinent." *Id.* at 86. To the extent that this could be considered a ruling, the trial court's statement that it would not allow evidence of Holliday's reputation for peacefulness as a child was not an abuse of discretion. Holliday's reputation growing up was "too remote in time" to be relevant. *See, e.g.*, *State v. Gregory*, 158 Wn.2d 759, 782, 147 P.3d 1201 (2006) (excluding evidence of prior behavior as irrelevant because it was "too remote in time"), *overruled on other grounds by State v. W.R., Jr.*, 181 Wn.2d 757, 336 P.3d 1134 (2014). As the trial court noted, "How he was as a child may be entirely different than how he is as an adult." VRP (Jan. 8, 2020) at 85.

### 2. Experience caring for children

Holliday also argues the trial court violated his right to present a defense when it excluded evidence that he "grew up in a home where his mother provided day[ ]care, that he has been caring for small children since he was a child himself, and that he has extensive experience caring for small children." Opening Br. of Appellant at 20. We hold the trial court did not abuse its discretion in ruling on the evidence Holliday offered.

We review a trial court's decision to exclude evidence, including its "decision regarding the sufficiency of the foundation," for an abuse of discretion. *State v. Callahan*, 87 Wn. App. 925, 935, 943 P.2d 676 (1997). A trial court abuses its discretion if its decision to exclude evidence is "manifestly unreasonable or exercised on untenable grounds or for untenable reasons." *State v.*

*Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007). It is an abuse of discretion "if the trial court relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law." *Id.* at 284.

       a.      Character evidence

To the extent that Holliday sought to offer testimony showing he is "good" with children, or cares for them "appropriately," this would have been admissible character evidence if it were offered in the form of reputation testimony from a neutral and generalized community. ER 404(a)(1), 405(a). But Holliday failed to offer witnesses from a neutral and generalized community.

Generally, character evidence is inadmissible "for the purpose of proving action in conformity therewith on a particular occasion," but there is an exception for the defendant to offer evidence of "a pertinent trait of character." ER 404(a)(1). For purposes of applying ER 404(a)(1), "'a pertinent character trait'" is a relevant one, meaning "'one that tends to make the existence of any material fact more or less probable.'" *State v. Perez-Valdez*, 172 Wn.2d 808, 819-20, 265 P.3d 853 (2011) (internal quotation marks omitted) (quoting *City of Kennewick v. Day*, 142 Wn.2d 1, 6, 11 P.3d 304 (2000)).

Defendants may present character evidence in an effort to convince the jury that "'one of such character would not have committed the crime charged.'" *Day*, 142 Wn.2d at 5 (quoting *State v. Kelly*, 102 Wn.2d 188, 195, 685 P.2d 564 (1984)). Admissible character evidence may be presented through "testimony as to reputation." ER 405(a). To offer reputation evidence, the defendant must be able to lay a foundation showing that the evidence is "based on perceptions in the community," rather than the witness's personal opinion. *State v. Thach*, 126 Wn. App. 297,

315, 106 P.3d 782 (2005), *overruled on other grounds by State v. Case*, 13 Wn. App. 2d 657, 466 P.3d 799 (2020). "To establish a valid community, the party seeking to admit the reputation evidence must show that the community is both neutral and general." *State v. Land*, 121 Wn.2d 494, 500, 851 P.2d 678 (1993).

For example, in *Thach*, the defendant sought to admit his sister's testimony that he had a reputation for being peaceful and nonviolent. 126 Wn. App. at 315. In upholding the trial court's exclusion of the sister's testimony, this court reasoned that "a family is not 'neutral enough [and] generalized enough to be classed as a community.'" *Id.* (alteration in original) (quoting *State v. Lord*, 117 Wn.2d 829, 874, 822 P.2d 177 (1991), *abrogated on other grounds by State v. Schierman*, 192 Wn.2d 577, 438 P.3d 1063 (2018)); *cf. Lord*, 117 Wn.2d at 874 (rejecting reputation evidence for impeachment purposes where the proposed witnesses were "not equipped to provide an unbiased and reliable evaluation" of the individual's general reputation). The community where the defendant resides or works may be an appropriately neutral and general community. *See Callahan*, 87 Wn. App. at 936; *Land* at 121 Wn.2d 497-99.

Holliday proffered as witnesses his family and friends and a single co-worker who had seen him interact with children. These witnesses were prepared to testify that "based on their observations, [Holliday] was good with children and was slow to anger." CP at 46.[4]

When the trial court considered Holliday's motion in limine to admit their testimony, it ruled, "[A]*t this time* I'm going to rule that *these* people should not be able to come in and testify

---

[4] If these witnesses were to testify that based on their observations, they personally believed Holliday was good with children and slow to anger, this would be inadmissible as opinion evidence. The Rules of Evidence do not permit "proof of character in the form of an opinion." *State v. Mercer-Drummer*, 128 Wn. App. 625, 632, 116 P.3d 454 (2005). ER 405(a) requires proof of character in the form of "testimony as to reputation."

16

as to . . . [Holliday's] tendencies with regard to children." VRP (Jan. 8, 2020) at 78 (emphasis added). It expressly concluded in its oral ruling that testimony showing Holliday's tendency to care for young children appropriately was character evidence, and it concluded the proffered witnesses were too "closely linked" with Holliday to comprise a "neutral community." *Id.* at 81. The trial court then advised Holliday, "[I]f there were some neutral parties that you were going to proffer, that might change how the Court looks at it." *Id.* at 80.

It is an accurate statement of the law that reputation testimony must be given by members of a neutral and generalized community. *Land*, 121 Wn.2d at 500. The trial court did not abuse its discretion by reasoning that the defendant's friends and family are not typically neutral nor sufficiently generalized enough to reflect reputation in the community. *See Thach*, 126 Wn. App. at 315. Holliday failed to proffer any other witnesses, even though the trial court invited him to proffer "neutral parties." VRP (Jan. 8, 2020) at 80.

     b.  Specific instances of prior conduct

To the extent Holliday sought to offer testimony describing specific instances when he was good with children or had cared for children appropriately, this evidence was inadmissible on direct examination. A defendant may offer proof of specific instances of conduct if the defendant's character trait "is an essential element of a charge, claim, or defense." ER 405(b). Otherwise, inquiry into "relevant specific instances of conduct" is only permitted on cross-examination. ER 405(a). "Character is not an essential element of any charge, claim, or defense for the crime of assault." *State v. Stacy*, 181 Wn. App. 553, 566, 326 P.3d 136 (2014). Therefore, Holliday was limited under ER 405(a) to offering reputation evidence.

c.      Experience

To the extent Holliday sought to offer testimony merely stating the fact that he had prior experience caring for children, that evidence, without more, was irrelevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Irrelevant evidence is inadmissible. ER 402. That Holliday interacted with or was responsible for other children on other days does not, without more, make it any less likely that Holliday shook KP on the day of his death.

Even if we assume the mere fact of experience was relevant, its exclusion was nevertheless harmless error for the same reason. The nonconstitutional harmless error test requires the defendant to show that "'within reasonable probabilities . . . the outcome of the trial would have been materially affected' had the error not occurred." *State v. Barry*, 183 Wn.2d 297, 317-18, 352 P.3d 161 (2015) (alteration in original) (internal quotation marks omitted) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)). Holliday fails to show a reasonable probability that evidence of his experience with children, without more information on the quality of his caregiving, could have materially affected the outcome of the trial.

Holliday's arguments for why this evidence is relevant suggest that what Holliday truly wanted to admit was the character evidence discussed above—that he tended to be good with children and care for them appropriately. Holliday argues evidence of his past experience "would have given the jury context," would have "given credence to Holliday's version of events – that [KP] was already unresponsive when Holliday shook [KP] to wake him up," and would have "created reasonable doubt about when and how hard Holliday shook [KP]." Opening Br. of

18

Appellant at 20-21. These arguments demonstrate that Holliday sought to offer evidence "for the purpose of proving action in conformity therewith on a particular occasion." ER 404(a). He wanted the jury to believe that because Holliday cared for children *appropriately* in the past, Holliday must have cared for KP *appropriately* on the day of KP's death. This is character evidence. As discussed above, Holliday failed to comply with the requirements for offering character evidence in ER 404(a)(1) and ER 405(a).[5]

B.     Constitutional Question

Although the trial court's evidentiary rulings were not erroneous, we consider de novo whether the exclusion of evidence violated Holliday's right to present a defense. *State v. Jennings*, slip op. at 4-5 (Wash. Feb. 3, 2022), https://www.courts.wa.gov/opinions/pdf/993378.pdf. The Washington Supreme Court recently clarified, "*If the evidence is relevant*, the reviewing court must weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence to determine if excluding the evidence violates the defendant's constitutional rights." *Id.* at 5 (emphasis added). As discussed above, Holliday failed to "produce relevant evidence." *Id.*

With regard to Holliday's reputation for peacefulness, testimony from Holliday's friend about his childhood reputation would have been too remote in time to be relevant, and the record does not show that Holliday ever offered more current, and therefore relevant, reputation testimony from this witness. As for Holliday's experience caring for children, the mere fact that he cared for other children on other days was not relevant when divorced from any testimony describing the nature and quality of Holliday's caregiving. And Holliday failed to offer evidence that he tended

---

[5] Holliday does not make an argument based on ER 404(b), nor did he do so below.

to care for children appropriately through character witnesses from a neutral community, even when expressly invited to do so by the trial court. When a defendant does not exercise their right to produce relevant evidence in support of their defense, the absence of that evidence at trial is not a constitutional violation.

Moreover, Holliday was not barred from presenting his version of the events or testimony about other possible causes of KP's death. Holliday's version of events was that KP had been on the floor with a bottle when he suddenly lost consciousness. Holliday said he then shook KP in an effort to rouse him. Although Holliday did not testify at trial, law enforcement officers testified to Holliday's statements about what had happened, including his statements that KP "seemed to have fainted" or to have "just fallen over." 1 VRP at 28, 130. Holliday's defense was a general denial focused on presenting the jury with an alternative medical explanation for KP's injuries and death. Holliday relied on statements that KP previously had pneumonia and had been sick during the days prior to his death. From this, Holliday argued that an infection could have caused KP to develop a blood clot, which could have caused intracranial pressure, which in turn could have caused KP to develop subdural and retinal hemorrhages and to suffer brain damage.

Both KP's mother and KP's great-grandmother testified that they had seen Holliday care for KP before, they did not have concerns about his ability to care for KP appropriately, and KP seemed comfortable with him. In closing, Holliday's counsel repeated KP's mother's testimony that she "never saw [Holliday] lose his temper" or "do anything to those kids that shouldn't be done." 6 VRP at 1228. So Holliday was able to rely on testimony that was specific to how he had interacted with KP, which tended to show that he cared for KP appropriately.

In sum, despite any evidentiary restrictions, Holliday was able to present his theory of the case—that KP's death was caused by a blood clot in his brain and that there was no evidence to indicate Holliday would violently shake a child. Holliday cannot now rely on evidence that was irrelevant and evidence that he failed to produce at the time of trial to claim that his right to present a defense was violated. We hold Holliday's constitutional right to present a defense was not violated.

## II. ASSISTANCE OF COUNSEL

Holliday also argues his trial counsel was ineffective for failing to call Dr. Lefkowitz as a witness at trial. Lefkowitz would have testified to his opinion that KP did not die from abusive head trauma, and this testimony "would have given the jury the opportunity to weigh the credibility of two [defense medical expert] witnesses instead of only one." Opening Br. of Appellant at 28. According to Holliday, the decision not to call Lefkowitz "could not be the result of any legitimate trial strategy" because Lefkowitz was "easily identified," "available as a witness[] who would have provided exculpatory testimony," and the "case came down to a credibility contest between doctors." *Id.* We disagree.

Effective assistance of counsel is guaranteed under both the federal and state constitutions. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prove ineffective assistance, Holliday must show that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced him. *Estes*, 188 Wn.2d at 457-58. "[A] failure to show either prong will end the inquiry." *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

Deficient performance is performance that "falls 'below an objective standard of reasonableness.'" *Estes*, 188 Wn.2d at 458 (quoting *State v. McFarland*, 127 Wn.2d 322, 334, 899 P.2d 1251 (1995)). "The threshold for the deficient performance prong is high, given the deference afforded to decisions of defense counsel in the course of representation," and we strongly presume that counsel's representation was reasonable. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). "If trial counsel's conduct can be characterized as legitimate trial strategy or tactics, it cannot serve as a basis for a claim." *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). The defendant bears the burden of showing "the absence of any conceivable legitimate tactic." *Classen*, 4 Wn. App. 2d at 541.

"Deciding whether to call a witness is a matter of legitimate trial tactics that presumptively does not support a claim of ineffective assistance of counsel." *State v. Davis*, 174 Wn. App. 623, 639, 300 P.3d 465 (2013). To overcome this presumption, the defendant must show that counsel "failed to adequately investigate or prepare for trial." *Id.*

Holliday primarily relies on *State v. Jones*, 183 Wn.2d 327, 352 P.3d 776 (2015). There, the Supreme Court held that trial counsel was ineffective because of "counsel's unexplained failure to interview clearly identified and accessible witnesses." *Jones*, 183 Wn.2d at 345. However, Holliday's briefing cites exclusively to the court's prejudice prong analysis. *After* concluding that Jones's trial counsel's decision not to call additional witnesses could not have been strategic, the court concluded there was a reasonable probability that, had the additional witnesses been called, the outcome of Jones's trial may have been different. *Id.* at 344. It reasoned that the case involved a "credibility contest" between each side's witnesses. *Id.* If the additional witness were called, "the jury would have had the opportunity to weigh the credibility of two [defense] witnesses—rather

than just one"—against the State's five witnesses, and some of their testimony would have bolstered the credibility of another defense witness and provided some corroboration. *Id.*

In addressing the deficiency prong, the court concluded that Jones's counsel's decision could not have been strategic where counsel failed to interview a witness and therefore "'did not have any idea what [the witness] would have said about this case.'" *Id.* at 341. The Supreme Court stated, "We can certainly defer to a trial lawyer's decision against calling witnesses if that lawyer investigated the case and made an *informed* and reasonable decision against conducting a particular interview or calling a particular witness." *Id.* at 340.

Here, regardless of whether the addition of Dr. Lefkowitz's testimony could have impacted the outcome at trial, Holliday fails to show that his trial counsel's performance was deficient. It is apparent that trial counsel investigated Lefkowitz as a potential witness and that counsel knew what testimony Lefkowitz would likely provide at trial. Lefkowitz's medical opinions were thoroughly investigated in order to address the State's *Frye* motion, and Lefkowitz previewed what his trial testimony would entail at a pretrial evidentiary hearing. Thus, trial counsel's decision not to call Lefkowitz at trial was an informed one.

Trial counsel's decision not to call Lefkowitz was also strategic. At the *Frye* hearing, Lefkowitz shared his opinion that he did not believe abusive head trauma caused KP's death. He also offered some corroboration of Dr. Sperry's opinion that a blood clot in KP's brain could have caused his death, saying that he could not "rule . . . out" the possibility of a superior sagittal sinus thrombosis causing extensive retinal hemorrhages. VRP (Dec. 16, 2019) at 55. This opinion was merely corroborative, however, and Lefkowitz did not offer any new or different scientific evidence to support Sperry's theory.

Lefkowitz also admitted during the *Frye* hearing that extensive retinal hemorrhages are "mostly associated with nonaccidental head trauma" and that his initial opinion was that "it was 80 to 90 percent probable that this injury was from abusive head trauma." *Id.* at 54, 61-62. Lefkowitz's opinion at the evidentiary hearing that he was "90 percent certain that [abusive head trauma] was *not* the situation in this patient" was "a 180-degree change." *Id.* at 65 (emphasis added). Given the inconsistencies in Lefkowitz's statements and the corroborative nature of his opinion, it was reasonable trial strategy for counsel not to call him as a witness.

"Deciding whether to call a witness is a matter of legitimate trial tactics that presumptively does not support a claim of ineffective assistance of counsel." *Davis*, 174 Wn. App. at 639. Holliday fails to overcome this presumption and show an absence of legitimate trial tactics. He fails to show deficient performance on this record.

CONCLUSION

We hold that the trial court did not violate Holliday's right to present a defense and that Holliday fails to show his trial counsel was constitutionally ineffective. We affirm.

No. 54383-4-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Lee, C.J.

Maxa, J.

25